UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: JURY ISSUE | ) ) ) ) ) ) ) ) ) | Civil Action No. 07-mc-505 (RMC) |

THE DISTRICT OF COLUMBIA'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO
<u>LILLIANN WILLIAMS' MOTION FOR AN ORDER TO SHOW CAUSE</u>

The District of Columbia, D.C. Public Schools ("DCPS"), and Principal Cheryl Warley (collectively, "the District"), by and through undersigned counsel, hereby submit this Memorandum of Points and Authorities in Opposition to Lilliann Williams' Motion for An Order to Show Cause in the above-referenced matter, in accordance with LCvR 7(b).

The District opposes the Motion because it is procedurally improper and because Ms. Williams' claims are substantively meritless. Ms. Williams' "excessing" was entirely unrelated to her jury service, notwithstanding that she did not lose any pay, seniority, or any other employment benefits.

Introduction

Petitioner Williams was employed as a guidance counselor at J.O. Wilson Elementary School. Petition ¶ 8.

Ms. Williams failed to complete any Student-Support Team ("SST") documents for the period of September through December of 2006, an essential part of her duties. Declaration of Cheryl Warley, dated December 3, 2007 ("Warley Decl."), ¶ 12. Despite the fact that students potentially needing special-education services could not be evaluated without those reports, Ms. Williams did not complete them, even after it was discussed with her. *Id.*

Sometime in early 2007, petitioner was chosen to serve on a jury in a federal matter, but did not immediately inform Ms. Warley. Warley Decl. ¶ 7. Ms. Williams continued to receive her full pay and benefits while on jury service. *Id*., ¶ 5; Declaration of Francisco Millet, dated November 29, 2007 ("Millet Decl."), ¶ 4.

In February of 2007, J.O. Wilson's budget was reduced. Warley Decl. ¶ 15. As a result, the school's Local School Restructuring Team ("LSRT") was required to reduce expenditures and eliminate a position. *Id*.; Millet Decl. ¶ 8.[1] Typically, J.O. Wilson and other schools "excess" one or more positions each year in response to shrinking budgets. Millet Decl. ¶ 8.[2]

The LSRT unanimously recommended (and DCPS approved) the elimination of the guidance-counselor position at J.O. Wilson, after a careful review of the needs of the students and the school as a whole, in light of the reduced budget mandated by DCPS. Millet Decl. ¶¶ 5–8; Warley Decl. ¶ 17.

After the completion of the school year, Ms. Williams was transferred (as a guidance counselor) to another elementary school with no loss of pay, seniority, or any other employment benefit. Millet Decl. ¶ 10; Warley Decl. ¶ 16.[3]

---

[1] The LSRT is a group of "educational stakeholders," including administrators, parents, teachers, union representatives and others who advise a school on matters of local school policy. *See* Millet Decl. ¶ 6; Warley Decl. ¶ 15.

[2] "Excessing" is defined in the Washington Teachers' Union collective-bargaining agreement ("CBA") as "The involuntary transfer and assignment of a teacher from a work location to another due to enrollment and/or budgetary constraints." A copy of the current CBA is available online at http://wtulocal6.org/pages/contract.html.

[3] Petitioner references the CBA in her exhibits, *see* Ex. C, n.2, but "suggests" that the voided attempt to change her evaluation rating reflected an "intention" to prevent Ms. Williams from exercising her rights under the CBA. *See id*. As noted herein, however, the attempted change of Ms. Williams' evaluation was voided immediately at the request of the Union, and there is no indication in the record of any attempt by Ms. Williams or the Union to utilize the CBA's procedures subsequently to avoid being "excessed," perhaps because to do so,

Argument

The decision to "excess" Ms. Williams was not related in any way to her jury service. The District here complied at all times with local and federal law, and with the Constitution.

The petitioner here claims a violation of 28 U.S.C. § 1875, the Jury Service Improvements Act ("JSIA"). Petitioner's evidence is insufficient to demonstrate such a violation, and her arguments regarding the JSIA are incorrect as a matter of law. Petitioner claims that *any* change in an employee's working conditions resulting from jury service violates the JSIA, but has provided no controlling or persuasive case law on this point.

Petitioner's counsel has captioned this matter as a "motion for an order to show cause," a procedure generally reserved for serious contempt or emergency matters, but there is no "emergency" here in any sense of the word, as Ms. Williams became aware of her "excessing" no later than June of 2007, almost five months ago, but was almost immediately transferred to another elementary school in the same position, with no loss of pay, seniority, or other benefits.[4]

---

an affected employee "must initiate a waiver request that includes a defensible explanation why excessing him/her would result in a detriment or hardship to the mission of the school and its school improvement plan." CBA, § C(5).

    There is a similar lack of evidence that either petitioner or her Union ever attempted to administratively appeal or "grieve" the decision to excess the position. *Cf.* D.C. Official Code § 1-605.02 (2007 Supp.) (powers of Public Employee Relations Board); *Johnson v. District of Columbia*, 244 F.R.D. 1, 9 (D.D.C. 2007) (terminated employee covered by CBA generally required to exhaust administrative remedies under District's Comprehensive Merit Personnel Act).

    [4]    The instant motion appears to be little more than a creative attempt to avoid the standards governing emergency injunctive relief, which petitioner has no hope of meeting here. *See, e.g., Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (emergency injunctive relief "is an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion."). At a minimum, a plaintiff seeking emergency injunctive relief must make a threshold showing of irreparable injury. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Because petitioner here has only alleged economic injuries, which may be remedied financially if she ultimately prevails, those injuries

Contrary to petitioner's arguments, there is no case law explicitly supporting the bald proposition that "any change" in an employee's working conditions violates JSIA. Indeed, the two cases she cited entirely support the District here.

Petitioner contends that *In re Heritage Propane*, 2007 WL 433290 (E.D. Tenn. 2007), an unreported case, supports her position because it found that "elimination of benefits otherwise available" constitutes employer "reprisal" in violation of the JSIA. P.Mem. at 3; *Heritage, supra*, *1. Here, of course, no "benefits" at all were eliminated, and the conduct of the employer in *Heritage* was far more egregious than anything petitioner encountered. In that case, the employer had required the employee to take "personal vacation days" for his days of jury service, but changed its policy and restored the vacation days after being alerted to the JSIA by the court. *Id*. Nonetheless, the employer *again* required the employee to take vacation days for jury service. After the court convened a show-cause hearing, counsel for Heritage proffered that "the policy change had inadvertently not been communicated to its regional managers." *Id*.

The court then found that Heritage's actions were contemptuous, "likely" amounted to violations of both the JSIA and a similar state law, and were "aggravated" by the fact that they were taken twice. *Id*., *4. Despite these findings, the court dismissed the show-cause, because the violations "were not the result of a calculated and intentional plan . . . ." *Id*.

Nothing in petitioner's own evidence rises to the level of the actions criticized in *Heritage*. Similarly, petitioner relies on *Perkins v. Sara Lee Corp.*, 839 F.Supp. 393 (W.D. Va. 1993) to support her contention that the JSIA is violated any time an employer takes away an employee's "autonomous and relaxed working conditions." P.Mem. at 3.

---

cannot, as a matter of law, be considered "irreparable." *See, e.g., Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Preliminarily, the District is constrained to note that petitioner failed to point out that *Perkins* was subsequently vacated. *See Perkins v. Sara Lee Corp.*, 852 F.Supp. 1321 (W.D. Va. 1994). Notwithstanding this, the facts in *Perkins* are completely inapposite to the instant matter, and only serve to highlight the gap between petitioner's evidence and the minimum required to show a violation of the JSIA. The juror-employee in *Perkins* was a delivery driver servicing various retailers who "set his own hours and worked autonomously." *Perkins*, 839 F.Supp. at 394. Once the employee notified his employer about his selection for what ultimately resulted in five weeks of jury service, a dramatic list of punitive and/or harassing measures resulted, including:

- His supervisor left a message for the employee, saying that she needed to speak with him "about getting out of jury duty." *Id*. at 396.

- After receiving written confirmation of the employee's selection, the employer sent him a letter to present to the court saying, in part, that "his salary is based on his sales and for him not be working would create a financial hardship for him. Please excuse him from jury duty at at [sic] this time." *Id*.[5]

- His supervisor required him to work on Saturdays to complete the work he missed. *Id*. 397.

- His supervisor informed him that he could no longer use his company vehicle to drive his niece two miles in the morning to her bus stop, because she "was not his dependent child." *Id*.

- His supervisor required him to attend a morning meeting at her home in a gated community, but left his name off the list of people authorized to enter. *Id*. at 398.

- His supervisor rode with him on his rounds one day, and issued written reprimands, *inter alia*, for failure to wear his uniform and for parking in a fire lane, even after the supervisor spoke with a passing county policeman, who "laughed" and said that "no one would write a ticket for parking in the fire lane." *Id*. at 398–99.

- His supervisor demanded the immediate return of a company-provided rental van, called the state police and the post office for directions to the employee's home, and appeared

---

[5] Even worse, the employee's supervisor told her supervisor (who actually drafted the letter) that the employee had requested it, but the employee had not. *Id*. The employee did not submit the letter to the court.

there the next day with another employee to retrieve the van, even after the employee indicated that he did not want someone from the company to come to his home.

- The employer require the employee "single-handedly to correct five weeks of neglect" on his routes due to his jury service, even after the employee was told (incorrectly) that no substitute help was available to work those routes while he was on jury duty. *Id.* at 400–402.

This "parade of horribles" comes nowhere near what occurred to Ms. Williams here, who was simply transferred to another school, in the same position, and without the loss of any pay, seniority or other benefits. The *Perkins* court found "retaliation" *not* just in the single action of taking away the employee's "autonomous and relaxed working conditions," but in the cumulative effect of the employer's actions, "by forcing him to comply with company policy at its whim, by subjecting him to excessive written criticism, and by embarrassing him with punitive retraining and inappropriate intrusions onto his property." *Id*. at 402.[6]

Here, even assuming her allegations to be true, the only category of such incidents that could remotely apply to Ms. Williams is the single, written reduction of her evaluation (from above-average to simply average), which action was rescinded within 48 hours with no further effect.

While Ms. Williams claims that her new school is "less desirable" because of the "loss of relationships" she had at J.O. Wilson, these losses are simply not compensable under the JSIA. *See, e.g., Shea v. County of Rockland*, 810 F.2d 27, 28 (2nd Cir. 1987) (JSIA's "other benefits" may include "commissions, insurance benefits, sick leave, vacation pay, use of a company car, or

---

[6] Despite the outrageous nature of the employer's conduct in *Perkins*, the court nonetheless imposed the maximum JSIA fine of $1,000 for only *one* of the violations—the employee's termination—because it occurred only days after an Assistant United States Attorney explicitly put the employer on notice regarding that law's requirements. The court held that while the other violations were similarly "serious," it declined to impose the statutory maximum penalty. The District avers that the incidents described in the instant petition are far distant from this threshold.

any other economic or 'fringe' benefits commonly associated with employment."). Ms. Williams did not lose any of these things. *See id.* at 29 ("'other benefits' when read in the context of an employment relationship cannot be construed to cover impairment of a worker's peace of mind.").

## Conclusion

For the reasons set forth above, the Motion for Order to Show Cause should be denied.

DATE: December 3, 2007                    Respectfully submitted,

                                              LINDA SINGER
                                              Attorney General for the District of Columbia

                                              GEORGE C. VALENTINE
                                              Deputy Attorney General, Civil Litigation Division

                                                 /s/ Ellen A. Efros
                                              ELLEN A. EFROS, D.C. Bar No. 250746
                                              Chief, Equity Section I
                                              441 Fourth Street, N.W., 6th Floor South
                                              Washington, D.C. 20001
                                              Telephone: (202) 442-9886
                                              Facsimile: (202) 727-0431

                                                 /s/ Andrew J. Saindon
                                              ANDREW J. SAINDON, D.C. Bar No. 456987
                                              Assistant Attorney General
                                              Equity I Section
                                              441 Fourth Street, N.W., 6th Floor South
                                              Washington, D.C. 20001
                                              Telephone: (202) 724-6643
                                              Facsimile: (202) 727-0431
                                              andy.saindon@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| _____ ) | | |
| ) | | |
| ) | | |
| ) | | |
| IN RE: JURY ISSUE        ) | Civil Action No. 07-mc-505 (RMC) | |
| ) | | |
| ) | | |
| _____ ) | | |

ORDER

Upon consideration of Lilliann Williams' Motion for Order to Show Cause, the Memoranda of Points and Authorities in Support thereof and in opposition thereto, her Petition Pursuant to the Jury System Improvements Act, the entire record herein, and it appearing that the relief should be denied, it is hereby:

ORDERED, that Lilliann Williams' Motion for Order to Show Cause be, and hereby is, DENIED, and it is

FURTHER ORDERED, that the Petition Pursuant to the Jury System Improvements Act is hereby DISMISSED.

SO ORDERED.

DATE: _____         _____
                                 ROSEMARY M. COLLYER
                                 United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: JURY ISSUE ) | Civil Action No. 07-mc-289 (RMC) |

### DECLARATION OF CHERYL WARLEY

Pursuant to 28 U.S.C. § 1746, I, Cheryl Warley, declare and state as follows:

1. I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

2. Since August of 2002, I have been employed as the Principal of J.O. Wilson Elementary School. Prior to my current position, I was Assistant Principal at Terrell Junior High School and MacFarland Middle School. Prior to that, I worked as a Math Teacher at Eastern High School. I have worked for D.C. Public Schools ("DCPS") for over 30 years.

3. My educational background includes a Bachelor's Degree in Elementary Education from South Carolina State University, an Advanced Degree in Mathematics from Georgetown University, a Master's Degree in Curriculum and Instruction from National Louis University in Chicago, Illinois, and a Master's Degree in Education Leadership from George Mason University.

4. I have reviewed the Petition filed by Ms. Lilliann Williams in this matter and find most of the allegations she makes to be inaccurate. The decision to "excess" Ms. Williams was completely unrelated to her jury service. First of all, the position of counselor was excessed. Excessing is not referred to by person, but by position. When Ms. Williams' position was

excessed, J.O. Wilson ES could not hire anyone to replace her, as that money was eliminated from its budget.

5.  Ms. Williams was transferred to another school, Seaton Elementary, with no loss of pay, seniority, or any other benefits. While on jury service, Ms. Williams continued to receive full pay and benefits. At J.O. Wilson, Ms. Williams was referred to as Dr. Jackson, her professional title.

6.  Ms. Williams makes a number of untrue allegations, starting with her claim that she "promptly" presented her summons for Grand Jury to my "Administrative Assistance" [sic] as instructed. Petition ¶ 10. My assistant did get a phone call from Ms. Williams about her selection, but Ms. Williams never submitted anything in writing to the school, such as the appropriate summons.

7.  Because she was not a classroom teacher, I did not have daily contact with Ms. Williams, and so I was not immediately aware that she was on long-term jury duty, only finding out about it two weeks later. I thought she was out sick. Ms. Williams' discussion of my encounter with Mr. Lester Chance is incorrect. See Petition ¶ 13. Mr. Chance approached me one morning in the building as I was leaving the cafeteria. He asked me if I had seen Dr. Jackson. I told him that I thought she was on jury duty, and would not be in today. He then stated that that could not be, because they were on jury duty together and (he said) they were dismissed to leave at the same time. He shared with me that the two of them were in the same jury pool. I never showed any displeasure or resentment to Mr. Chance. I simply have no idea what he means when he says that I had "a disapproving look" on my face. See Chance Decl., p. 2.

8.  Because of Ms. Williams' failure to submit to our office the proper papers alerting us of her being chosen for jury service, I did, in fact, call the Court to inquire. The female person I

spoke with confirmed Ms. Williams' selection, and stated that each juror selected was given a document to bring to his or her employer. The court clerk faxed me a document within thirty minutes that confirmed Ms. Williams' selection.

9. In my first year as Principal at J.O. Wilson, an employee had called in after presenting us with a Jury Summons, saying that he had been selected for long-term jury duty. He informed me that he would be absent for an extended period of time. I believed him. Subsequently, however, I discovered that he had lied to me and had not been selected, and that he was not showing up for work but continuing to receive his paycheck. Although I regret having to do it, this experience taught me not to take an employee's word when it comes to a long-term absence, but to require written proof.

10. Moreover, my recollection of Ms. Williams' allegations in paragraph 14 of her Petition differs from hers. I recall that at a regular morning meeting I reminded everyone who expects to be out on either a short or long-term basis to let me know as soon as they can, because we have to cover those absences. And while I believe I did use surgery, jury duty, maternity leave, etc., as examples, I never used Ms. Williams or anyone else's name, nor did I use the word "volunteer."

11. Additionally, regarding her allegations in paragraph 15, I have no idea what she's talking about. I did not have any negative contact with Ms. Williams. Our contact was always on a professional basis. Obviously, once she was selected for jury service, our chances for communication were greatly reduced, as she would only come to work some Fridays, but I never spoke with her "in an intimidating or hostile way" either before, during, or after her service.

12. Paragraph 16 of the Petition is similarly wide of the mark. The rating for Ms. Williams had nothing to do with her jury service, but with her failure to complete important

reports that occurred *before* she was ever summoned to Court. Ms. Williams failed to complete the SST (Student-Support Team) documents during the period from September 1, 2006, through December of 2006. When I discussed this with Wanda Zachary, our Special-Education Coordinator, and the Psychologist, Beckie Harlen, they both told me that the documents were incomplete and needed more information from the teachers who submitted them to Dr. Jackson. They both stated that Dr. Jackson was made aware of this in early November. The SSTs were returned to her, but she never resubmitted the reports, incomplete or otherwise. The students that were referred to SST could not be evaluated without those reports. Consequently, Ms. Williams' failure to do this important task led to delays in getting assistance for students in need of academic support.

13. Ms. Williams' other, less serious, allegations are equally untrue. I never told Ms. Williams or anyone else that they could no longer store purses in the school office or receive visitors in their offices; this simply did not happen. I am not aware of any incident in which Ms. Williams was denied school letterhead; Ms. Williams always asked my Administrative Assistant for letterhead. I do not keep letterhead in my office. As I understand it, letterhead is the property of DCPS, and is to be used for official purposes only. It is not freely given to all requestors.

14. While an "exceeds expectations" rating may last three years, it can be lowered at any time if circumstances warrant. I did attempt to lower Ms. Williams' rating to "meets expectations," mainly due to her failure to complete the SST reports that should have been submitted between October and December 2006. Again, this occurred *before* she was ever chosen for jury service. As she correctly recounts, however, I agreed to drop that action immediately after contact from the teacher's union, in part because I had missed the deadline to complete a "structured" observation of Ms. Williams. Consequently, her rating returned to

"exceeds expectations." I understood that the document then became invalid once I wrote the word "void" on it. Dr. Jackson requested a copy of the document after I told her I was going to shred it, and I provided her with one.

15. Ms. Williams' allegations regarding the budgetary process are similarly flawed. For the fiscal year 2007–08, I received a budget from DCPS in February of 2007 which reduced our school's enrollment from 319 students to 308. The drop in enrollment also brought a reduction to our budget, which would require reductions in a variety of expenditures, including two staff positions and school supplies needed for academics. I presented this information to the Local School Restructuring Team ("LSRT"), a group made up of administrators, parents, teachers, union representatives, community representatives, support staff, and others who advise schools on matters of local school policy. Contrary to Ms. Williams' allegations, I have no control over who serves on the LSRT. The staff nominates and votes on the team members. The principal has no input on who serves, not even a vote.

16. The LSRT and I discussed ways to meet this shortfall. Ultimately, the LSRT unanimously recommended that our school's guidance-counselor position and instructional facilitator position be excessed. The decision was not personal to Ms. Williams. I repeatedly confronted the LSRT members to think hard about that decision, but we ultimately determined, collaboratively, to do so. The decision reflected a careful review of the needs of the students and the school as a whole, in light of the reduced budget given to us by DCPS.

17. Unfortunately, I have had to excess two or three people every year as Principal, due to shrinking budgets based on student enrollment. However, as I indicated above, Ms. Williams—like many excessed employees—was transferred to a different school at the same

salary, with no loss of seniority or any other benefits. These rehires are facilitated through an annual career fair that DCPS holds each summer.

18. DCPS has told us repeatedly that administrators (including Principals and Assistant Superintendents) cannot tell employees personally when they are excessed, but must wait for the "official" letter from DCPS to be delivered. If Ms. Williams never received the letter, it is the fault of DCPS and not anyone at J.O. Wilson. I categorically deny that I threatened to fire anyone for telling Ms. Williams that she would be excessed. A Principal does not have the authority to fire for a situation such as this. The Human Resources Office within DCPS tells the Principal to make sure that the LSRT does not leak names of the positions that will be excessed.

19. I recall being contacted in late June 2006 by a DCPS human-resources staff member seeking Ms. Williams' contact information, because she had not responded to letters regarding DCPS's summer career fair.

This declaration consists of eighteen (19) numbered paragraphs on six (6) pages. I declare under penalty of perjury that the foregoing is true and correct.

Executed on  12/3/07.

Cheryl Warley

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: JURY ISSUE ) Civil Action No. 07-mc-289 (RMC)

### DECLARATION OF FRANCISCO MILLET

Pursuant to 28 U.S.C. § 1746, I, Francisco A. Millet, declare and state as follows:

1. I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

2. Since August 25, 2005, I have been employed as an Assistant Superintendent for the D.C. Public Schools ("DCPS"). My duties include supervising all schools and Principals in the Elementary Division, Cluster III, including J.O. Wilson Elementary School and its Principal, Cheryl Warley. Prior to my current position, I worked as the Principal of Adams Elementary School in Adams Morgan.

3. My educational background includes a Bachelor's Degree in Education from the University of Texas, a Master's Degree in Education from Texas Woman's University, and thirty years of service as a teacher, principal and central-office administrator.

4. I have reviewed the Petition filed by Ms. Lilliann Williams in this matter and find most of the allegations she makes to be inaccurate. The decision to "excess" Ms. Williams' position was completely unrelated to her jury service. DCPS fully supports its employees performing jury duty, and although it should go without saying, both during and after her jury service, Ms. Williams continued to receive her full pay and benefits.

5. In this matter, the decision to excess the guidance-counselor position at J.O. Wilson was recommended unanimously by the Local School Restructuring Team ("LSRT"), as a result of a DCPS-mandated reduced budget for the school.

6. Ms. Williams' representations regarding the LSRT are simply inaccurate. The Collective Bargaining Agreement with the teachers' union defines the LSRT as "A consensus group of educational stakeholders (administrators, parents, teachers, union representatives, community representatives, support staff, students and others as deemed appropriate), who are elected and/or appointed to advise the Board on matters of local school policy." The current LSRT determines who will be on the next year's team; typically, the local PTA elects the parent representatives, and the union does the same for its members. Let me be clear, however—the Principal of the school has *no* input on the makeup of the LSRT at all. Consequently, Ms. Williams' allegations that Ms. Warley "handpicked" the members of the LSRT or controlled its decision are entirely false.

7. All decisions to excess positions at schools in my cluster come to me for review, so I discussed the decision here repeatedly with Ms. Warley, who actually challenged the LSRT on its recommendation, asking them if the school could function well without a guidance counselor.

8. School budgets are calculated on a per-student basis, so when enrollment shrinks, the budget must be reduced. In recent years, unfortunately, enrollment has been shrinking (at J. O. Wilson and many other schools), so DCPS has been required to reduce budgets, which requires schools to excess positions as the primary method to reduce expenditures at a school. Our ultimate standard in this process is, of course, to look at the good of the school as a whole when determining which positions to eliminate. Positions are excessed, not people. Before transferring employees who are occupying excessed positions, staff in Human Resources is obligated to

review their building seniority and certification to see if they can be placed in another position in the school. These procedures are outlined in the union contract, and DCPS made every attempt to determine if there was a position at J.O. Wilson that Ms. Williams could be transferred to.

9. As Ms. Warley has indicated, Principals are not permitted to discuss excessing of specific positions until affected staffers have been notified by letter from DCPS. Moreover, other administrators (like me) are similarly prohibited from discussing excessing in advance of the DCPS notification.

10. Ms. Williams was transferred to another school that I supervise, Seaton Elementary, with no loss of pay, seniority, or any other benefits.

This declaration consists of ten (10) numbered paragraphs on three (3) pages. I declare under penalty of perjury that the foregoing is true and correct.

Executed on 11-29-07.

_____
Francisco Millet

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: JURY ISSUE | ) ) ) ) ) ) ) ) | Civil Action No. 07-mc-505 (RMC) |

ORDER

Upon consideration of Lilliann Williams' Motion for Order to Show Cause, the Memoranda of Points and Authorities in Support thereof and in opposition thereto, her Petition Pursuant to the Jury System Improvements Act, the entire record herein, and it appearing that the relief should be denied, it is hereby:

ORDERED, that Lilliann Williams' Motion for Order to Show Cause be, and hereby is, DENIED, and it is

FURTHER ORDERED, that the Petition Pursuant to the Jury System Improvements Act is hereby DISMISSED.

SO ORDERED.

DATE: _____  _____
ROSEMARY M. COLLYER
United States District Judge