**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

)
)
**LILLIANN WILLIAMS,**                                 )
)
      **Plaintiff,**                                    )
)
     **v.**                                              )      **Civil Action No. 1:07-mc-505**
)
**DISTRICT OF COLUMBIA**                          )
)
      **Defendant.**                                 )
_____)

### PLAINTIFF LILLIANN WILLIAMS' POST-TRIAL BRIEF

SUTHERLAND ASBILL & BRENNAN LLP
Gregory S. Kaufman (D.C. Bar No. 464208)
Kerry B. Verdi (D.C. Bar No. 478486)
1275 Pennsylvania Ave., NW
Washington, D.C. 20004
Tel. No. (202) 383-0100
Fax No. (202) 637-3593

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................ 3

III.    JURY SYSTEM IMPROVEMENTS ACT ...................................................4

IV.     THE FACTS SUPPORT A FINDING THAT DEFENDANT VIOLATED THE
        JUROR ACT..................................................................................................5

        A.      The Relationship Between Ms. Williams and Principal Warley Changed
                Abruptly when Ms. Williams' Jury Service Began ...............................6

        B.      Principal Warley Undermined Ms. Williams' Credibility by Declaring
                that She Volunteered for Jury Duty ......................................................7

        C.      Principal Warley Expressed Her Discontent for Jury Service to Another
                J.O. Wilson Employee .........................................................................8

        D.      Routine Acts by Ms. Williams Suddenly Became Unacceptable to
                Principal Warley ..................................................................................8

        E.      Principal Warley Attempted to Lower Ms. Williams' Performance Rating
                Because of her Absence from Work ....................................................9

                1.      Principal Warley's Alleged Basis for Lowering Ms. Williams' Rating
                        is a Red-Herring.....................................................................10

                2.      Any Failures Regarding SST Processing were Unfairly Blamed on Ms.
                        Williams ...............................................................................11

        F.      Principal Warley Engineered the Excessing of Ms. Williams Because of Her
                Jury Duty ...........................................................................................13

                1.      The 2006-2007 J.O. Wilson LSRT Was Never Properly Constituted ....14

                2.      The J.O. Wilson LSRT Intentionally Excluded Independent Members
                        from Participating ..................................................................15

                3.      The LSRT's Recommendation to Excess Ms. Williams Was Not Valid
                        Because the Quorum Requirement Was Not Met....................................16

                4.      The LSRT Process was Cloaked in Secrecy Despite the Requirement
                        that it be Open to the Public....................................................17

5.      Principal Warley Left the LSRT with No Choice but to Excess Ms. Williams ................................................................................................18

6.      The Excessing Took a Personal and Professional Toll on Ms. Williams ................................................................................................18

V.      PRINCIPAL WARLEY HAS A CREDIBILITY PROBLEM .......................................19

A.      Principal Warley Denied that Her Relationship with Ms. Williams was Anything other than Wonderful ............................................................20

B.      Principal Warley's Claimed Lack of Knowledge Regarding Ms. Williams' Jury Service is not Credible ................................................................21

C.      Principal Warley's Recollection of Her Conversations with Lester Chance Regarding Ms. Williams' Jury Service Is Not Trustworthy ...............................22

D.      Principal Warley Contradicted Ms. Lomax-Scott's Testimony on Every Important Point ................................................................................23

VI.     CONCLUSION ................................................................................................24

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518 (11th Cir. 1991) ...........................................5

*Madonia v. Coral Springs Partnership, Ltd.*, 731 F. Supp. 1054
(S.D. Fla. 1990).................................................................................................................5

STATUTES AND RULES

28 U.S.C. § 1875 ..................................................................................................................1

28 U.S.C. § 1875(a) .............................................................................................................4

28 U.S.C. § 1875(b) .............................................................................................................5

## I.    INTRODUCTION

Plaintiff, LilliAnn Williams, by and through undersigned counsel, hereby submits her

Post-Trial brief, following the trial in the above captioned matter on June 24-25, 2008.  Ms.

Williams alleges she was subjected to intimidation, coercion and changes in working conditions

by the District of Columbia Public Schools ("DCPS") in retaliation for her absence from work

due to jury service.  The evidence is clear that DCPS' actions, including those of the Principal of

J.O. Wilson Elementary School ("J.O. Wilson"), violated the Jury System Improvements Act, 28

U.S.C. § 1875 ("Juror Act").  Ms. Williams is entitled to all relief available under the Juror Act

as a result of Defendant's multiple violations of the Act.

Ms. Williams was formerly the guidance counselor at J.O. Wilson, where she had been

employed in various capacities for 20 years.  While at J.O. Wilson, Ms. Williams was summoned

to appear at the United States District Court for the District of Columbia for possible service on a

jury in a capital murder trial.  Ms. Williams appeared for service and was ultimately selected as a

juror in the *United States v. Gooch* trial, which began on February 7, 2007 and ended on June 6,

2007.  Ms. Williams fulfilled her obligation of citizenship by dutifully serving as a juror for four

months.

As soon as Ms. Williams learned that she had been selected for jury service in this

lengthy trial, she promptly notified the Principal of J.O. Wilson, Cheryl Warley.  Almost

immediately, Ms. Williams was subjected to intimidation and coercion at the hands of Principal

Warley, to the point that Principal Warley stopped speaking to her.  Principal Warley went out of

her way to embarrass and humiliate Ms. Williams – telling the staff that Ms. Williams

volunteered for jury duty (suggesting she was not dedicated to her job) and declaring, without

justification, that Ms. Williams could no longer store her purse in the school's office even though she had been doing so for years. The Principal went as far as to attempt to use Ms. Williams' absence as a basis for arbitrarily lowering her performance rating.

Each of these acts changed Ms. Williams' working conditions for the worse, but the coercion and intimidation did not end. In fact, the Principal's unhappiness with Ms. Williams culminated with her engineering Ms. Williams' ouster from J.O. Wilson. The record reflects that Principal Warley anticipated the day Ms. Williams would leave J.O. Wilson and Ms. Williams' jury service provided her with the opportunity to hasten Ms. Williams' departure, albeit involuntarily. Principal Warley used the allegedly independent Local School Restructuring Team ("LSRT") to have Ms. Williams declared excess to the school's needs. However, there was nothing independent about the J.O. Wilson LSRT and the process was set up in such a way that the only result that the LSRT could reach was to follow Principal Warley's recommendation that Ms. Williams be excessed. As a result, Ms. Williams no longer had a job at J.O. Wilson and was reassigned to another school a week before the 2007-2008 school year began.

Defendant did not offer credible evidence to rebut the strong evidence of Juror Act violations presented by Plaintiff. With numerous witnesses providing testimony supportive of Ms. Williams' claims, the Defendant offered a litany of denials from only one witness – Principal Warley. However, the record demonstrates that Principal Warley's testimony should not be believed. She admitted to having her employees lie for her and to creating fraudulent documents to suit her needs. Yet, despite overwhelming evidence to the contrary, Defendant will ask this Court to credit her testimony, where she denied virtually every material fact or accusation adverse to her interests. In light of Principal Warley's propensity for lies and deception, her testimony is simply not credible and should not be believed.

The consistent and trustworthy evidence in the record supports the fact that Ms. Williams endured intimidation, coercion and changes in working conditions at the hands of Principal Warley as a result of her jury service. Ms. Williams struggled through a difficult and disturbing murder trial, only to be embarrassed and humiliated by Principal Warley because she admirably performed her civic duty. The Juror Act is intended to protect people like Ms. Williams from just such a situation. This Court should find in favor of Ms. Williams so that she may enjoy these protections and to ensure that other employers are put on notice that such disregard for our jury system will not be tolerated.

## II.    BACKGROUND

Prior to being excessed, Ms. Williams had worked at J.O. Wilson for 20 years. Tr. 13/21. During that time, she held several positions throughout the school, however, from 1996 until she was excessed in 2007, she served as the school's guidance counselor. Tr. 13/23-25. During that time, she formed wonderful relationships both within the school and throughout the community. Tr. 14/11-21. In December 2006, Ms. Williams received a summons for jury service. Tr. 18/11-17; Pl. Ex. 1. She promptly presented this summons to Principal Warley's administrative assistant, as she was required to do. Tr. 19/6-8. She reported to Court on January 9, 2007, and filled out a juror questionnaire. Tr. 19/18-22. As instructed, she called the Court each day to find out if she had to return for jury service, and was next told to report on February 7, 2007. Tr. 19/23-25; 20/3-10. Upon arriving at the courthouse, she learned that she had been selected to serve on the jury. Tr. 20/12-15. That evening Ms. Williams called Principal Warley at home and told her that she had been selected to serve on a jury that was expected to last anywhere between four to six months, and that she would be serving Monday through Thursday, and would report for work on Fridays. Tr. 20/18-25.

As this was a capital murder trial, Ms. Williams understandably found her jury service to be a very stressful experience. Tr. 21/12-23. Nonetheless, she reported to work each Friday that Court was not in session, where she was expected to complete all of her normal duties, which included meeting with students, returning messages, working on the Student Support Team ("SST") paperwork, and completing both truancy and attendance reports. Tr. 23/1-6. In fact, no one was assigned to assist Ms. Williams with any of her responsibilities while she was serving on jury duty. Tr. (6/25 p.m.) 37:3-32.[1]

Despite her grueling schedule and the stressful experience of serving in a capital murder trial, Ms. Williams returned to work at J.O. Wilson the day after the verdict was returned, without so much as taking one personal day off. Tr. 22/6.

## III.    JURY SYSTEM IMPROVEMENTS ACT

The Juror Act, prohibits an employer from discharging, threatening to discharge, intimidating, or coercing any permanent employee by reason of such employee's jury service, or the attendance or scheduled attendance in connection with such service. 28 U.S.C.§ 1875(a). An employer who violates the Juror Act:

1)    shall be liable for damages for any loss or other benefits suffered by an employee by reason of such violation;

2)    may be enjoined from further violations of this section and ordered to provide other appropriate relief, including but not limited to the reinstatement of any employee discharged by reason of his jury service; and

3)    shall be subject to a civil penalty of not more than $1,000 for each violation as to each employee.

---

[1] Plaintiff identifies citations to the transcript for the second day (June 25, 2008) of the trial using the date and a.m/p.m. to distinguish between the transcripts for the morning and afternoon sessions. This distinction is necessary because the transcript pages for this day are not consecutively numbered. Citations to the transcript that do not identify a date relate to the first day of trial. The transcript pages for the first day are consecutively numbered.

28 U.S.C. § 1875(b).

Courts have consistently held that intimidation and coercion existed where supervisors made derogatory statements about jury service, were angry at employee absences despite having notice of the service obligation and/or there was a change in the employee's working conditions as a result of jury service. *See Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1526-27 (11th Cir. 1991) (finding evidence sufficient for a jury to conclude employee was intimidated or coerced in violation of the Juror Act based on employer's statements inferring hostility towards jury service, prolonged anger at employee's absence and ongoing reprimands); *Madonia v. Coral Springs Partnership, Ltd.*, 731 F. Supp. 1054, 1056 (S.D. Fla. 1990) (finding that the change in working conditions and the change in attitude of the employer towards the employee as a result of the employee's jury service smacked of retaliation).

The evidence in this case supports the fact that Ms. Williams' supervisor made derogatory statements about her jury service, was angry at her absences despite having notice of the service obligation and that she suffered a change in her working conditions as a result of jury service. Thus, DCPS, through its agent Principal Warley, violated the Juror Act and, as such, Ms. Williams is entitled to the relief sought in her Petition.

## IV. THE FACTS SUPPORT A FINDING THAT DEFENDANT VIOLATED THE JUROR ACT

The record contains numerous examples of conduct by the Defendant that violates the Juror Act. Defendant's hostility towards jury service by its employees, when that service will cause inconvenience to the employer, is evident from the actions taken by Principal Warley. When Principal Warley realized that Ms. Williams' extended jury service was going to impact her job and her school, she began a campaign of retaliatory acts (each of which independently

violate the Juror Act) and that ultimately resulted in Ms. Williams' excessing from J.O. Wilson. In addition to each of these individual violations, the totality of the change Ms. Williams suffered to her working conditions resulted in a further violation of the Juror Act.

**A.  The Relationship Between Ms. Williams and Principal Warley Changed Abruptly when Ms. Williams' Jury Service Began**

Ms. Williams' working environment and her ability to communicate with Principal Warley changed immediately with the start of her extended jury service. The fact that this abrupt change corresponded directly with Ms. Williams' service is evidence of Principal Warley's disdain for an employee who she viewed as "volunteering" to allow a civic responsibility to interfere with her school and her job at J.O. Wilson.

Ms. Williams worked for Principal Warley for four-and-a-half years prior to being called to jury duty. Tr. 15/21-25. During that time, Principal Warley and Ms. Williams had a cordial, professional and friendly relationship. Tr. 15/23-16/22. As Ms. Williams testified, she "was not a person that was in her click or anything like that, but [the two] had a very good working relationship." Tr. 16/1-11.

This relationship changed immediately when Ms. Williams began her service on the *Gooch* jury. Tr. 16/12-14. Principal Warley simply stopped speaking to Ms. Williams. Tr. 16/12-22. Ms. Williams would speak to Principal Warley and get no response. *Id.* On occasions when Ms. Williams was able to report to work during her service, she would try to discuss issues with the Principal only to be ignored and even avoided. *Id.* Ms. Williams was expected to fulfill all of her duties as counselor despite the fact that she was only at school one day a week. Tr. 36/6-37/21. This difficult task was made even more challenging by the fact that Principal Warley stopped communicating with her. This change in Ms. Williams' employer's attitude, which occurred as a result of her jury service, constitutes a violation of the Juror Act.

**B.**    **Principal Warley Undermined Ms. Williams' Credibility by Declaring that She Volunteered for Jury Duty**

In addition to ceasing to work with Ms. Williams at a professional level, Principal Warley went out of her way to undermine Ms. Williams' credibility in the eyes of J.O. Wilson's staff. Principal Warley spread obvious falsehoods to her staff regarding Ms. Williams' jury service in an attempt to leave the impression that Ms. Williams was not a team player.

Within two weeks from the beginning of her jury service, Ms. Williams came to learn that Principal Warley had discussed her absence at a J.O. Wilson staff meeting. On one of the first (February 16, 2007) or second (February 28, 2007) Fridays she was able to report to school, Ms. Williams was approached by a teacher who asked her why she had volunteered for jury duty. Tr. 26/8-25. The teacher indicated that during a faculty meeting, Principal Warley announced that Ms. Williams had volunteered to serve as a juror. *Id.* Ms. Williams was understandably surprised by the question and confused as to why Principal Warley would make such an announcement given that no one can volunteer for jury service. Tr. 26/8-27/2. On February 22, 2007, Principal Warley called the Clerk of the Court to check on Ms. Williams, questioning why the Court would have a school counselor serve on a jury for an extended length of time. Tr. 27/3-28/3; (6/25 a.m.) 11/7-11; Pl. Exh. 2.

Principal Warley's statement to the staff and her belief that a school counselor should not be away from school for an extended absences demonstrate her hostility towards Ms. Williams' service. This attack on Ms. Williams' work ethic and integrity in front of the school staff again caused a change in Ms. Williams' working conditions in violation of the Juror Act.

### C.     Principal Warley Expressed Her Discontent for Jury Service to Another J.O. Wilson Employee

Principal Warley voiced her discontent for jury service and expressed her preference that her employees figure out ways to avoid serving. As it happened, J.O. Wilson's building engineer, Lester Chance, was in the same jury pool as Ms. Williams. Tr. 67/3-68/1. After attending the second day of jury selection, Mr. Chance returned to J.O. Wilson where he mentioned to Principal Warley that he and Ms. Williams were in the same jury pool. Tr. 68/2-24. For the next six business days Mr. Chance called the Court to see if he needed to return the following day. Tr. 69/2-14. During this six-day period, Mr. Chance had another conversation with Principal Warley about the fact that neither he nor Ms. Williams had been excused from jury duty. *Id.* After a week of calling, Mr. Chance was excused. Tr. 69/6-16. Upon his return to school, he mentioned to Principal Warley that he was not chosen and Principal Warley responded by questioning how he got out of it. Tr. 69/17-70/7. Principal Warley proceeded to ask why Ms. Williams was chosen and questioned why Ms. Williams had not done what Mr. Chance had done to get out of jury duty. Tr. 70/8-16. Such actions by Principal Warley illustrate her attitude toward jury service and support Ms. Williams' contention that she was retaliated against by Principal Warley.

### D.     Routine Acts by Ms. Williams Suddenly Became Unacceptable to Principal Warley

In the rare instance that Principal Warley communicated with Ms. Williams while she was on jury duty, these contacts were arbitrary and made in a hostile way. It was well known to the personnel in the school's main office, including Principal Warley, that Ms. Williams stored her purse in the office secretary's desk drawer. Tr. 28/4-30/13. In fact, Ms. Williams had stored

her purse there for nearly thirteen years. *Id.* On one of the Fridays she was able to report to

work, Principal Warley questioned Ms. Williams as to why she was putting her purse in the

drawer as she attempted to do so. *Id.* Ms. Williams thought this was a strange question given

that Principal Warley had seen her secure and retrieve her purse from the desk drawer on

numerous occasions without complaint. *Id.* Ms. Williams explained that she did not have

anywhere to lock her purse up, nevertheless, Principal Warley unapologetically told her she was

not allowed to store her purse in the drawer anymore. *Id.*

      While this confrontation may seem relatively minor, it is telling of Principal Warley's

change in attitude toward Ms. Williams after her jury service began. When not ignoring Ms.

Williams, Principal Warley would lash out at her for acts that had never previously been a

problem. This behavior intimidated Ms. Williams and changed, for the worse, the conditions

under which she worked in violation of the Juror Act.

      **E.**    **Principal Warley Attempted to Lower Ms. Williams' Performance Rating Because of her Absence from Work**

      On June 12, 2007, only days after completing her jury service and returning to work, Ms.

Williams was asked to sign a performance evaluation conducted by Principal Warley despite the

fact that Ms. Williams was not due to be evaluated for another year. Tr. 30/24-31/17. The

evaluation lowered her rating from "Exceeds Expectations" to "Meets Expectations." Tr. 30/24-

36/6. Ms. Williams immediately requested a meeting with Principal Warley to discuss the

evaluation. Tr. 31/9-32/9. She got no response from the Principal until two days later when

Principal Warley burst into her office and said "you weren't here and I'm not going to do your

work." Tr. 32/6-16. Ms. Williams explained that she had been at work only one-day per week

and stayed late on those days to get work done. Tr. 32/13-16. Principal Warley repeated that she

was not going to do Ms. Williams' work for her. *Id.* The evaluation was eventually voided by

Principal Warley after she was contacted by the Teachers Union because she failed to follow proper procedures for conducting an evaluation.  Tr. 34/24-36/6; Pl. Exh. 5.

### 1. Principal Warley's Alleged Basis for Lowering Ms. Williams' Rating is a Red-Herring.

Principal Warley sought to justify her arbitrary lowering of Ms. Williams' performance rating by accusing her of failing to process certain referrals to the Student Support Team ("SST"), which Ms. Williams chaired.  Tr. 32/15-23.  According to Principal Warley, DCPS psychologist Dr. Rebecca Harlan identified the processing problem, called DCPS Headquarters downtown and, as a result, a whole team of people from the special education department came to the school to fix the problem.  Tr. 32/15-23; (6/25 p.m.) 54/21-55/9.  In reality, no such events occurred.  Principal Warley's untimely evaluation of Ms. Williams was not about minor processing issues but was directly related to Ms. Williams' four month absence due to jury duty.

A new procedure for SST processing caused Ms. Williams to have to redo some of the work she had already performed – which she did on her one-day-a-week schedule.  Ms. Williams previous practice was to include the student strategies with the other information in one document which the parents signed.  Tr. 37/2-39/18.  While on jury duty, Ms. Williams learned that the strategies had to be broken out into a separate document and that separate document needed to signed by the parents.  *Id.*  Over the course of several Fridays, Ms. Williams arranged to have the parents return to sign the new form (which contained the exact same information as the previous document they signed).  *Id.*

Similarly, Principal Warley told Ms. Williams there was a problem with the student referral folders, and that Principal Warley was not going to do her work for her.  Understandably, Ms. Williams wanted to review the folders to see what work had been performed in her absence.

10

Tr. 32/24-34/18.  She reviewed the folders and discovered that the folders were exactly as she left them.  *Id.*

Furthermore, Dr. Harlan's testimony contradicts the Principal's statement to Ms. Williams that Dr. Harlan told her that a team had to come fix the mess created by Ms. Williams. Tr. (6/25 p.m.) 54/13-55/9.  Dr. Harlan testified that it was not uncommon for her to go back to the SST to get information that was not included but was needed.  Tr. (6/25 p.m.) 65/8-66/21. Dr. Harlan denied that anyone was sent from downtown to complete the SST work at J.O. Wilson.  Tr. (6/25 p.m.) 67/3-7.  She did indicate that some files were returned to the SST for additional information.  *Id.*  As she described the situation, "it was nothing that was significant" and had no effect on the work she had to do or on the SST process as a whole.  Tr. (6/25 p.m.) 67/15-68/11; (6/25 p.m.) 69/20-70/15.

> **2.**     **Any Failures Regarding SST Processing were Unfairly Blamed on Ms. Williams.**

Whether the Court perceives the issues regarding Ms. Williams' SST work as minor, as Dr. Harlan noted, or significant, as Principal Warley alleged, the attempt to lower Ms. Williams' rating because of them is inescapably tied to her jury service.  Principal Warley did nothing to support Ms. Williams while she was away from school four-days-a-week, but she was ready to pounce on her with a lowered rating within days of her full-time return to school.  The record reflects that regardless of whether any failures occurred, Principal Warley's lack of support set Ms. Williams up to fail.

At the time of her testimony, Ms. Williams still did not fully know what the alleged problem was with SST referrals because she was never told there was a problem and was never given a chance to fix it.  Tr. 38/21-39/11.  Neither the Principal nor any teacher ever expressed to Ms. Williams that referrals to the SST had not been completed.  Tr. 49/19-51/2.  Principal

Warley never offered to provide any assistance to Ms. Williams in order to help her with her many duties while she was on jury duty and never assigned anyone to help her with the SST process or any other task Ms. Williams was required to perform.  Tr. 38/21-39/1; Tr. (6/25 p.m.) 36/6-37/21.  Nevertheless, as Principal Warley stated, Ms. Williams was expected to perform all of her duties as counselor, including SST work.  Tr. (6/25 p.m.) 36/6-37/21.

Defendant would have this Court believe that Ms. Williams' processing failures occurred in 2006 – before her jury service – and that two teachers complained in March/April 2007 to Principal Warley about two incomplete referrals.[2]  Tr. (6/25 p.m.) 48/5-49/14.  The fact that two teachers waited four to seven months to raise the issue with Principal Warley and Principal Warley never communicated it to Ms. Williams, when she could have tried to do something about it during her one-day-a-week work schedule, calls into the question the legitimacy of this claim and highlights just how important this issue was to Principal Warley at the time.  *Id.*  On the one hand Principal Warley said the SST work was the most important part of Ms. Williams' job (Tr. (6/25 p.m. 37/11-21) and, on the other, she declared that it did not occur to her that Ms. Williams had only been working one-day-per-week and that she "didn't pay close attention to the SSTs."  Tr. (6/25 p.m.) 50/23-52/16.

The reality is that the SST process became important to Principal Warley only after she realized she had reporting duties related to SST processing statistics.  Tr. (6/25 p.m.) 52/17-54/11.  Because of Ms. Williams' absence and the total lack of support provided to Ms. Williams (even as little as communicating complaints or concerns), Principal Warley was faced with the

---

[2] Regina Weatherby, a teacher at J.O. Wilson, claimed that a referral she made in September 2006 was not processed by Ms. Williams.  Tr. 113/16-134/2.  This claim is dubious given the fact that, as claimed by Ms. Weathersby, the referral related to a sixth grader reading at a second grade level, yet Ms. Weathersby cannot recall ever following up with Ms. Williams regarding the referral.  Tr. 113/21-25.  One would think that such a situation would require immediate attention and the child's teacher would not wait at least seven months before following up.

fact that she was not going to be able to submit the statistics on time.  *Id.*  Principal Warley perceived that the delay in filing her statistics would make her look bad with her supervisors and she took it out on Ms. Williams by declaring that "we are not going to do your work for you" and, ultimately, attempted to lower her rating.

Principal Warley claimed she lowered the ratings of two teachers in addition to Ms. Williams because of SST failures.  Tr. (6/25 p.m.) 49/15-50/22.  Despite this claim, Principal Warley admitted that neither teacher actually had their rating category downgraded.  *Id.*  Only Ms. Williams received enough of a numerical lowering of her score to cause her category rating to drop from "Exceeds Expectation" to "Meets Expectation."[3]  *Id.*

Principal Warley's treatment of Ms. Williams in relation to the SST process exposes the impossible position Ms. Williams was put in because of the total lack of support provided to her while she was serving.[4]  Even more, the evidence supports the conclusion that Principal Warley attempted to lower Ms. Williams rating in retaliation for the fact that she believed J.O. Wilson's SST statistics would make her look bad to her supervisors.  Such retaliation violates the Juror Act.

### F.    Principal Warley Engineered the Excessing of Ms. Williams Because of Her Jury Duty

While Ms. Williams was serving on the jury, the J.O. Wilson Local School Restructuring Team ("LSRT") was meeting to discuss the next year's budget and the need to cut staff to meet the projected budget.  Local School Restructuring Teams are intended to be made up of school

---

[3] It bears noting that Principal Warley went out of her way to lower the rating of Ms. Williams within days of the end of the school year even though she knew for months that Ms. Williams had been excessed and would not be returning to J.O. Wilson in the Fall.  Tr. (6/25 p.m.) 46/10-47/8.

[4] Ms. Williams successfully processed more than twice as many SST referrals in the 2007-2008 school year at Seaton Elementary.  Tr. 36/9-23.  This success formed the basis for the exceeds expectations rating she received at Seaton.  *Id.*

personnel and community members who are supposed to work together to make decisions that are in the best interest of the school.  Tr. 80/3-12.  LSRT recommendations are made to the principal but the principal has ultimate decision-making authority.  Tr. 115/10-12.

LSRT's meet periodically and, when a quorum is met, can come to consensus as to what recommendations to make regarding the school plan, including staffing.  Pl. Exh. 6.  If the LSRT recommends reductions in staffing and the recommendation is followed, the affected staff member is declared excess to the school's needs.  Tr. 100/12-16.  Excessed teachers and counselors are then reassigned to other schools based on their seniority.  Pl. Exh. 17, pp. 15-17.  If they are not reassigned, they are terminated.  *Id.*  Excessed personnel are supposed to be informed of their excessing by letter received at the school before the end of the school year.  *Id.* at p. 15.

The J.O. Wilson LSRT voted unanimously on February 28, 2007 to recommend that Ms. Williams, and only Ms. Williams, be excessed for the following school year.  Exh. 10.  While the LSRT's action gave the appearance of being taken by an independent, properly constituted body, a closer examination reveals that this was not the case.  In fact, this LSRT was never properly constituted, lacked independence and was directed, not by the chairperson, but by Principal Warley.  By directing the LSRT's actions, and having already branded Ms. Williams as not being a team player in the staff's eyes, Principal Warley used the LSRT to accomplish her goal of ridding herself of Ms. Williams.  The evidence suggests that Principal Warley's disdain for Ms. Williams' perceived disloyalty was such that she wanted Ms. Williams out of her school.

### 1.    The 2006-2007 J.O. Wilson LSRT Was Never Properly Constituted.

A properly constituted LSRT in 2006-2007 was supposed to be made up of the following representatives:  one principal; one building representative; four teachers; four parents; one

support staff; and one community representative.  Pl. Exh. 6; Tr. 83/9-16.  J.O. Wilson's LSRT

lacked several of these representatives and was never properly constituted according to DCPS

guidelines.  Pl. Exh. 6.  Neither the Principal nor the LSRT Chairperson, Regina Weathersby,

could consistently identify all of the members of the LSRT and their positions.  Tr. 83/9-84/16;

(6/25 a.m.) 42/20-53/1; (6/25 a.m.) 61/5-14.  What is clear from their testimony, and the

documentation, is that the LSRT lacked two of the four required parents and the community

representative.  *Id.*; Pl. Exh. 23.  Even though the LSRT lacked three of the five non-DCPS

employee positions, it still appeared to have some independent community involvement through

the participation of two parents.  However, closer examination of the functioning of the LSRT

reveals that the LSRT had a semblance of independence in appearance only.  The reality is that

this body was never properly constituted and totally lacked participation from anyone

independent of Principal Warley or DCPS.

> **2.**     **The J.O. Wilson LSRT Intentionally Excluded Independent Members from Participating.**

Two parents were identified as being members of the LSRT for 2006-2007 – Ms. Hall

and Ms. Holder.  Pl. Exh. 23; Tr. 83/24-84/8; (6/25 a.m.) 61/5-14; (6/25 p.m.) 21/3-22/1.  These

parent representatives only served as window dressing for Principal Warley and the LSRT

because they did not participate at all.  In the case of Ms. Holder, her lack of participation was

the result of never being invited or informed of meetings.  Tr. 62/21-63/4.

Principal Warley provided contradictory testimony regarding the involvement of parents

and the community.  She testified that in her experience it is virtually impossible to get

community involvement in the school so she did not bother to solicit parental input for the

LSRT.  Tr. (6/25 a.m.) 44/6-22.  Yet she went out of her way to personally ask Ms. Holder to be

a member of the LSRT.  Tr. 61/24-62/16.  Ms. Holder agreed to be a member and was never

invited to attend any meetings.  Tr. 62/21-63/4.  It is likely that Ms. Hall had a similar experience.

It seems that Principal Warley was not interested in the community's input, or had given up, in favor of giving the appearance that the community was involved in important school decisions.  The charade of parental involvement went so far as to result in the forged signature of Ms. Holder on a document indicating that all LSRT members had reviewed the Final School Plan and Budget developed by Principal Warley and the LSRT.  Pl. Exh. 23; Tr. 63/5-65/9.  Ms. Holder had never seen the Plan and Budget document and never saw the document she supposedly signed acknowledging that she had reviewed it.  *Id.*  In fact, her name is misspelled on the document and her purported signature mimics the misspelling.  *Id.*

Behind the façade of independence was a body that was made up entirely of employees of J.O. Wilson who worked for Principal Warley.  Tr. 131/5-132/1.  Even the Chairperson of the LSRT was subordinate to the Principal.  Ms. Weathersby did not know that parents had to be informed of meetings; did not know that it was her responsibility to set-up meetings and set the agendas; and was not aware that a quorum was required for actions to be taken.  Tr. 84/17-85/23; 86/10-88/19.  All of these responsibilities were ceded to Principal Warley.  Tr. 86/17-87/25.  In fact, the minutes from the meetings involving Ms. Williams reveal that it was Principal Warley, not the Chairperson, who directed the meetings.  Tr. 91/14-93/18; Pl. Exhs. 8 and 10.

### 3.     The LSRT's Recommendation to Excess Ms. Williams was not Valid Because the Quorum Requirement was not Met.

No effort was made by the LSRT to ensure that the recommendation to excess Ms. Williams was made in accordance with the guidelines governing the LSRT.  Not inviting parents to the meetings not only affected the independence of the LSRT but also caused the LSRT to be unable to satisfy the quorum requirements.  Pl. Exh. 6 at p. 22.  The requirement was that a

majority of the required 13 members (this LSRT only had 10 named members), which must

include the principal or designee, building representative or designee, and at least one parent

representative, will constitute a quorum. *Id.* The only person in attendance that was a parent of

a child in the school was Shawn Smith and Principal Warley clearly stated that Ms. Smith filled a

teacher, not a parent, position on the LSRT. Pl. Exh. 10; Tr. (6/25 p.m.) 21/3-22/1.

Consequently, no quorum existed at the February 28, 2007 LSRT meeting.

> **4.    The LSRT Process was Cloaked in Secrecy Despite the Requirement that it be Open to the Public.**

The LSRT lacked independent voices, was never properly constituted and was shrouded

in secrecy even though the guidelines governing the LSRT dictated that its activities be open to

the public. The meetings of the LSRT were never open to the public contrary to the guidelines.

Tr. 87/11-88/5; 95/19-97/12; 101/20-107/16. The minutes from each meeting were never made

available to the public, contrary to the guideline requirements. Pl. Exh. 6; Tr. 88/6-19. Instead,

at the end of each meeting Principal Warley reminded each member that they were sworn to

secrecy. Pl. Exh. 7-8, 12 and 14. In fact, nobody noticed the conflict between the oath of

secrecy and the requirement that the minutes be posted for public viewing. Tr. 90/17-21. Not

surprisingly, the LSRT members chose to heed Principal Warley's warning.[5]  Pl. Exhs. 7-8, 12

and 14.

The secrecy went so far that Ms. Williams was not told by Principal Warley or anyone

else prior to the last day of school that she had been excessed as was required under the

Teachers' Union Collective Bargaining Agreement. Pl. Exh. 17. In prior years, excessed J.O.

---

[5] Principal Warley told Marion Lomax-Scott (former J.O. Wilson Business Manager) that she thought someone on the LSRT told Ms. Williams that she had been excessed and, if she found out who it was, they could lose their job. Tr. (6/25 p.m.) 79/1-4.

Wilson employees were presented with, and signed for, their excessing letters at school prior to the last day of school.  Tr. 40/2-41/17; 73/11-75/22.  Ms. Williams did not know that she had been excessed until she got a call during the Summer break that she was invited to a job fair for excessed teachers.  Tr. 41/20-43/1.  Ms. Williams found out a week before the next school year began that she had been assigned to Seaton Elementary, a school she knew nothing about, and to a principal who knew nothing about her.  Tr. 43/18-45/14.

### 5.    Principal Warley Left the LSRT with No Choice but to Excess Ms. Williams.

The minutes from the February 28, 2007 meeting, at which there was a unanimous vote to excess Ms. Williams, are clear that the only position up for a vote was the counselor's position.  Pl. Exh. 10.  Principal Warley directed the meeting, identified positions that could not be touched and gave the Committee the task of determining who on staff could do the counselor's jobs.  *Id.*; Tr. 97/11-101/7.  The only position left on the table for a vote was the counselor's position, so Ms. Williams' fate was sealed by Principal Warley.  Tr. 100/17-101/7; Pl. Exh. 10.

### 6.    The Excessing Took a Personal and Professional Toll on Ms. Williams.

The improper and retaliatory excessing of Ms. Williams was very difficult for her to endure physically, emotionally and professionally.  Ms. Williams spent a third of her life at J.O. Wilson, developing friendships within the school and the community.  Tr. 44/17-45/4.  For her, it was like losing a second family.  *Id.*  She had to leave behind many of the programs that she had established and cared for, including the FBI Special Agent program, peer mentoring program, intergenerational program and parent workshops.  Tr. 14/9-15/17.  She suffered from elevated blood pressure for a month after learning of her excessing and her hair started falling out.  Tr.

44/17-24.  In addition, Ms. Williams lost twenty years of building seniority she had built up.[6]

Tr. 59/8-12.  She considered giving up and retiring but instead decided to fight what she

perceived as an injustice so that no one else would have to go through what she went through.

Tr. 45/7-22.

Ms. Williams' decision to carry-on at Seaton meant she would have to report to work

with the stigma of being excessed.  As Ms. Williams explained, excessed employees are viewed

as being poor performers and not wanted.  Tr. 44/2-44/12.  She was "dumped" on Seaton's new

principal a week before school opened.  Tr. 44/7-14.  She had never met with the principal and

never interviewed for the job.  *Id.*  It was embarrassing and humiliating for Ms. Williams to be

viewed in that way after twenty years of dedicated service to the public school children of

Washington, D.C.  Tr. 44/17-45/14.

The evidence supports the conclusion that Ms. Williams was excessed, the ultimate

change in working condition, because of Principal Warley's displeasure with her jury service.

Thus, the excessing is yet another violation of the Juror Act.

## V.    PRINCIPAL WARLEY HAS A CREDIBILITY PROBLEM

The testimony of Defendant's primary witness, Principal Warley, is simply not credible.

Principal Warley refuted virtually every material fact and contradicted herself repeatedly.  The

Court is presented with the choice of believing the testimony of a single witness who is accused

of being the chief wrongdoer or believing the testimony of multiple witnesses, only one of which

has a stake in the case.  Because of Principal Warley's litany of denials, the Court is left with no

middle ground.  Unlike all of the other witnesses, Principal Warley is the only witness with an

---

[6] Under the Collective Bargaining Agreement, the employee with more building seniority has advantages regarding involuntary transfers and excessing over less senior employees.  Pl. Exh. 17 pp. 14-17.

admitted propensity for telling untruths and is the only witness who peddles in forged

documents. In light of the denials and contradictions, it is not reasonable to credit Principal

Warley's testimony over the testimony of Ms. Williams, Lester Chance, Dr. Harlan (*see supra*

IV(E)(1)) and Marion Lomax-Scott.

> **A.    Principal Warley Denied that Her Relationship with Ms. Williams was Anything other than Wonderful**

Ms. Williams testified extensively about how her previously good working relationship

with Principal Warley changed abruptly when she began jury duty. *See supra* § IV(A). Ms.

Williams explained how Principal Warley stopped speaking to her and avoided her when she

needed to speak with the Principal. *Id.* According to Principal Warley, none of this is true. Tr.

(6/25 p.m.) 11/7-12; (6/25 p.m.) 56/16-18. In Principal Warley's view, there were never any

conflicts or changes in what was a "wonderful" relationship. *Id.* The facts suggest otherwise.

Apparently, this relationship was so wonderful that Principal Warley: (1) called the Clerk of the

Court to check to see if Ms. Williams really was on jury duty; (2) tried to untimely lower Ms.

Williams' rating because she was not going to do her work for her; (3) had Ms. Williams

declared excess; (4) refused to allow Ms. Williams to store her purse in the main office; and (5)

announced to the staff that Ms. Williams had volunteered for jury duty. *See supra* § IV. Given

this record, Principal Warley is not credible when she claimed she had an unwaveringly

wonderful relationship with Ms. Williams.

Principal Warley denied she ever told the staff that Ms. Williams volunteered for jury

duty. Tr. (6/25 p.m.) 56/11-15. Ms. Williams is clearly more credible on this point given the

actions she took when she learned that this announcement had been made. After being

confronted by a teacher about Principal Warley's comment, Ms. Williams was so concerned that

she immediately brought her concerns to the attention of the Clerk of the Court. Tr. 26/8-28/3.

It was then that she learned that Principal Warley had called the Clerk to check on Ms. Williams' jury service. *Id.*

Principal Warley denied she ever spoke to Mr. Williams about storing her purse in the main office of the school. Tr. (6/25 p.m.) 11/25-12/5. Again, Ms. Williams is clearly more credible on this point. For the Court to believe Principal Warley, it has to believe that Ms. Williams dreamed up the event and invented her recollection of a conversation she had with Principal Warley about where else she could store her purse if not in the main office. Tr. 28/21-30/13. The fact that Principal Warley denied even knowing that Ms. Williams stored her purse in the school's main office, where the Principal's office is located, even though Ms. Williams had been doing so from the first day Principal Warley came to J.O. Wilson, severely undercuts the reliability of her denial. Tr. (6/25 p.m.) 55/10-14.

>    **B.    Principal Warley's Claimed Lack of Knowledge Regarding Ms. Williams' Jury Service is not Credible**

Principal Warley claimed she had no knowledge of Ms. Williams' jury duty during the first two weeks of Ms. Williams' service and assumed she was out sick. Tr. (6/25 p.m.) 29/5-10. This claim is simply not credible. Principal Warley initially claimed that Ms. Williams never submitted the Summons (Pl. Exh. 1) to her secretary. Tr. (6/25 p.m.) 29/20-24. When confronted with clear evidence that the Summons came from J.O. Wilson's files and was not part of the documentation faxed to her by the Court on February 22nd, Principal Warley changed her story. Principal Warley acknowledged that the Summons was submitted to her secretary but claimed that her secretary told her that she did not have the Summons when Principal Warley inquired. Tr. (6/25 p.m.) 31/20-32/10. Even more telling is the fact that Ms. Williams' testimony that she called Principal Warley at home on the night of February 7th to tell her she had been selected for a jury expected to sit for four months went unchallenged. Tr. 20/16-25.

Principal Warley's claim that she thought Ms. Williams was out sick is not believable, even ignoring the evidence that she knew otherwise. It is hard to believe that a principal would not check on an employee who was out sick for two weeks. Nevertheless, Principal Warley claimed that she never inquired as to why Ms. Williams was out of the office for two weeks, never asked anyone how she was doing, what was wrong with her or whether she was in the hospital. Tr. (6/25 p.m.) 29/5-19. In fact, all Principal Warley needed to do was to look at the Sign-In/Sign-Out log maintained in the main office and it would have shown that Ms. Williams was absent because of jury duty. Pl. Exh. 3. Principal Warley never bothered to check. Tr. (6/25 p.m.) 33/5-13.

The record reflects that Principal Warley knew from the outset that Ms. Williams was on extended jury duty. Her attempts to deny this knowledge demonstrate a lack of credibility and exposes the fact that Principal Warley attempted to cast Ms. Williams as an irresponsible employee who would just disappear for weeks at a time without informing her employer.

### C.    Principal Warley's Recollection of Her Conversations with Lester Chance Regarding Ms. Williams' Jury Service Is Not Trustworthy

Principal Warley's recollection regarding her conversations with Lester Chance regarding Ms. Williams' jury service completely contradicts Mr. Chance's testimony relating to these conversations. Given Principal Warley's testimony regarding her knowledge, or lack thereof, of Ms. Williams' jury service and what she claimed to have said to Mr. Chance, it is clear that Mr. Chance's testimony is credible and her related testimony is not.

Mr. Chance testified that during the first week of jury selection he had a conversation with Principal Warley in which he mentioned that neither he nor Ms. Williams had been excused. Tr. 69/2-14. After calling the Court each day for six days to see if he had been chosen, Mr. Chance found out that he had been released. Tr. 69/17-70/16. Shortly thereafter, he

mentioned to Principal Warley that he was not chosen and Principal Warley said, what did you do, why weren't you chosen and why didn't Ms. Williams do what [Mr. Chance] did. *Id.* Principal Warley later contradicted this testimony, stating that Mr. Chance told her that he and Ms. Williams were both released. Tr. (6/25 p.m.) 34/20-25. Principal Warley claimed to have told Mr. Chance that she thought Ms. Williams was still serving during this conversation. *Id.*

Principal Warley's testimony does not make sense in light of her testimony that she thought Ms. Williams was out sick for the first two weeks of her jury duty. Mr. Chance was released from jury duty during that two week period. Tr. 67/9-69/14. If Principal Warley really thought Ms. Williams was out sick, she could not have told Mr. Chance that she thought Ms. Williams was still on jury duty. Principal Warley offered this version of events in an attempt to refute Mr. Chance's testimony regarding her disdain for jury service, but, in so doing, the continuity of her story broke down. Such contradictions tend to occur when someone is telling a made-up story as opposed to recounting facts and events. Principal Warley's story just does not add up.

**D.    Principal Warley Contradicted Ms. Lomax-Scott's Testimony on Every Important Point**

Marion Lomax-Scott's testimony was completely contradicted by Principal Warley, leaving the Court with the option of believing one over the other. Given Principal Warley's penchant for telling falsehoods, her version of events related to Ms. Lomax-Scott should not be credited.

Ms. Lomax-Scott testified that, on multiple occasions, Principal Warley would ask her if Ms. Williams was going to retire so she could put Ms. Zachery in the counselor's position. Tr. (6/25 p.m.) 73/8-24. Principal Warley denied she ever made such statements. Tr. (6/25 p.m.) 38/5-16. Ms. Lomax-Scott testified that Principal Warley told her to go downtown because she

needed to check on her job.  Tr. (6/25 p.m.) 79/15-80/13.  Principal Warley claimed Ms. Lomax-Scott was just on an errand downtown when she learned she had been excessed.  Tr. (6/25 p.m.) 4/4-19.  Ms. Lomax-Scott testified that during a chance run-in with Principal Warley in a Wal-Mart parking lot, Principal Warley told her that Ms. Williams had been excessed, that someone on the LSRT told Ms. Williams about it and if she found out who it was, they could lose their job.  Tr. (6/25 p.m.) 78/18-79/13.  Principal Warley denied discussing the excessing of Ms. Williams at all during this encounter.  Tr. (6/25 p.m.) 45/12-46/9.

Finally, Principal Warley denied ever creating a false document under the name of one of her employees or forging (or having someone forge) one of her employees names on a document.  Tr. (6/25 p.m.) 57/4-15.  This testimony is simply false.  Ms. Lomax-Scott testified about a fictitious letter purported to have been written and signed by her on behalf of Principal Warley.  Tr. (6/25 p.m.) 74/3-78/17; Pl. Exh. 24.  The letter, written exclusively for Principal Warley's benefit, does not contain a single truthful statement and was not written or signed by Ms. Lomax-Scott.  *Id.*  In fact, Principal Warley urged Ms. Lomax-Scott to go along with the lies in the letter if anyone called to verify the information.  *Id.*  Ms. Lomax-Scott refused to do so.  Tr. (6/25 p.m.) 77/8-22.  Not only was Principal Warley's testimony on this issue false, the fact that such a letter was written and sent calls into question Principal Warley's honesty and trustworthiness.

## VI.    CONCLUSION

For the reasons set forth above, Defendant violated the Juror Act by intimidating, coercing and changing the working conditions of Ms. Williams by reason of her jury service.  As such, Ms. Williams is entitled, and should be given the choice of whether she wants, to be reinstated to her position as guidance counselor at J.O. Wilson and Defendant should be enjoined

from further violations.  In addition, Defendant is subject to a civil fine for each violation and should pay attorneys fees and expenses incurred on behalf of Ms. Williams.

Date:  August 29, 2008                                  Respectfully submitted,

                                                         _/s/ Gregory S. Kaufman_____
                                                         Gregory S. Kaufman (D.C. Bar No. 464208)
                                                         Kerry B. Verdi (D.C. Bar No. 478486)
                                                         Sutherland Asbill & Brennan LLP
                                                         1275 Pennsylvania Ave., NW
                                                         Washington, D.C. 20004
                                                         Tel. No. (202) 383-0100
                                                         Fax No. (202) 637-3593

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of August 2008, the undersigned caused to be filed

electronically with the Court Plaintiff's Post-Trial Brief and corresponding Findings of Fact and

Conclusions of Law.  I further caused true and correct copies of the same to be served upon the

following in the manner described below:

> Via U.S. Mail – First Class:
>
> Andrew J. Saindon
> Assit. Attorney General
> Office of the Attorney General for the District of Columbia
> Equity Section I Civil Litigation Division
> 441 4th Street, NW
> Washington, DC 20001

>   /s/ Gregory S. Kaufman_____
>    Gregory S. Kaufman

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **LILLIANN WILLIAMS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:07-mc-505** |
| ) | |
| **DISTRICT OF COLUMBIA** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

## PLAINTIFF LILLIANN WILLIAMS' FINDINGS OF
## FACT AND CONCLUSIONS OF LAW

Plaintiff, LilliAnn Williams, by and through its counsel of record, hereby submits these

proposed findings of fact and conclusions of law in the above captioned matter, in conjunction

with Ms. Williams' Post-Trial Brief.

### CONCLUSIONS OF LAW

### Jury System Improvements Act

1.      The Jury System Improvements Act ("Juror Act"), prohibits an employer from

discharging, threatening to discharge, intimidating, or coercing any permanent employee by

reason of such employee's jury service, or the attendance or scheduled attendance in connection

with such service.  28 U.S.C.§ 1875(a).

2.      An employer who violates the Juror Act:

    1)      shall be liable for damages for any loss or other benefits suffered
            by an employee by reason of such violation;

    2)      may be enjoined from further violations of this section and
            ordered to provide other appropriate relief, including but not
            limited to the reinstatement of any employee discharged by
            reason of his jury service; and

3)    shall be subject to a civil penalty of not more than $1,000 for
each violation as to each employee.

28 U.S.C. § 1875(b).

3.    Courts have consistently held that intimidation and coercion existed where supervisors made derogatory statements about jury service, were angry at employee absences despite having notice of the service obligation and/or there was a change in the employee's working conditions as a result of jury service. *See Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1526-27 (11th Cir. 1991) (finding evidence sufficient for a jury to conclude employee was intimidated or coerced in violation of the Juror Act based on employer's statements inferring hostility towards jury service, prolonged anger at employee's absence and ongoing reprimands); *Madonia v. Coral Springs Partnership, Ltd.*, 731 F. Supp. 1054, 1056 (S.D. Fla. 1990) (finding that the change in working conditions and the change in attitude of the employer towards the employee as a result of the employee's jury service smacked of retaliation).

## PROPOSED FINDINGS OF FACT

### I.    BACKGROUND

1.    Prior to being excessed, Ms. Williams had worked at J.O. Wilson for 20 years. Tr. 13/21.

2.    During her tenure at J.O. Wilson, Ms. Williams held several positions throughout the school, however, from 1996 until she was excessed in 2007, she served as the school's guidance counselor. Tr. 13/23-25.

3.    While at J.O. Wilson, Ms. Williams formed wonderful relationships both within the school and throughout the community. Tr. 14/11-21.

4.      In December 2006, Ms. Williams received a summons for jury service.  Tr. 18/11-17; Pl. Ex. 1.  She promptly presented this summons to Principal Warley's administrative assistant, as she was required to do.  Tr. 19/6-8.

5.      Ms. Williams reported to Court on January 9, 2007, and filled out a juror questionnaire.  Tr. 19/18-22.  As instructed, she called the Court each day to find out if she had to return for jury service, and was next told to report on February 7, 2007.  Tr. 19/23-25; 20/3-10.  Upon arriving at the courthouse, she learned that she had been selected to serve on the jury.  Tr. 20/12-15.

6.      Ms. Williams called Principal Warley at home the evening of the 7th and told her that she had been selected to serve on a jury that was expected to last anywhere between four to six months, and that she would be serving Monday through Thursday, and would report for work on Fridays.  Tr. 20/18-25.

7.      Ms. Williams found her jury service to be a very stressful experience.  Tr. 21/12-23.

8.      Ms. Williams reported to work each Friday that Court was not in session, where she was expected to complete all of her normal duties, which included meeting with students, returning messages, working on the Student Support Team ("SST") paperwork, and completing both truancy and attendance reports.  Tr. 23/1-6.

9.      No one was assigned to assist Ms. Williams in any of her responsibilities while she was serving on jury duty.  Tr. (6/25 p.m.) 37:3-32.[1]

---

[1] Plaintiff identifies citations to the transcript for the second day (June 25, 2008) of the trial using the date and a.m/p.m. to distinguish between the transcripts for the morning and afternoon sessions.  This distinction is necessary because the transcript pages for this day are not consecutively numbered.  Citations to the transcript that do not identify a date relate to the first day of trial.  The transcript pages for the first day are consecutively numbered.

10.     Despite her schedule and the stressful experience of serving in a capital murder trial, Ms. Williams returned to work at J.O. Wilson the day after the verdict was returned, without so much as taking one personal day off.  Tr. 22/6.

## II.    THE FACTS SUPPORT A FINDING THAT DEFENDANT VIOLATED THE JUROR ACT

11.     Defendant's hostility towards jury service by its employees, when that service will cause inconvenience to the employer, is evident from the actions taken by Principal Warley.

12.     When Principal Warley realized that Ms. Williams' extended jury service was going to impact her job and her school, she began a campaign of retaliatory acts (each of which independently violate the Juror Act) and that ultimately resulted in Ms. Williams' excessing from J.O. Wilson.

13.     The totality of the change Ms. Williams suffered to her working conditions resulted in a further violation of the Juror Act.

### A.    The Relationship Between Ms. Williams and Principal Warley Changed Abruptly when Ms. Williams' Jury Service Began

14.     Ms. Williams' working environment and her ability to communicate with Principal Warley changed immediately with the start of her extended jury service.  The fact that this abrupt change corresponded directly with Ms. Williams' service is evidence of Principal Warley's disdain for an employee who she viewed as "volunteering" to allow a civic responsibility to interfere with her school and her job at J.O. Wilson.

15.     Ms. Williams worked for Principal Warley for four-and-a-half years prior to being called to jury duty.  Tr. 15/21-25.  During that time, Principal Warley and Ms. Williams had a cordial, professional and friendly relationship.  Tr. 15/23-16/22.  Ms. Williams "was not a person

that was in her click or anything like that, but [the two] had a very good working relationship." Tr. 16/1-11.

16.     The relationship between Ms. Williams and Principal Warley changed immediately when Ms. Williams began her service on the *Gooch* jury.  Tr. 16/12-14.  Principal Warley simply stopped speaking to Ms. Williams.  Tr. 16/12-22.  Ms. Williams would speak to Principal Warley and get no response.  *Id.*

17.     On occasions when Ms. Williams was able to report to work during her service, she would try to discuss issues with the Principal only to be ignored and even avoided.  *Id.*

18.     Ms. Williams was expected to fulfill all of her duties as counselor despite the fact that she was only at school one day a week.  Tr. 36/6-37/21.  This difficult task was made even more difficult by the fact that Principal Warley stopped communicating with her.

19.     This change in Ms. Williams' employer's attitude, which occurred as a result of her jury service, constitutes a violation of the Juror Act.

**B.     Principal Warley Undermined Ms. Williams' Credibility by Declaring that She Volunteered for Jury Duty**

20.     Principal Warley went out of her way to undermine Ms. Williams' credibility in the eyes of J.O. Wilson's staff.  Principal Warley spread obvious falsehoods to her staff regarding Ms. Williams' jury service in an attempt to leave the impression that Ms. Williams was not a team player.

21.     Within two weeks from the beginning of her jury service, Ms. Williams came to learn that Principal Warley had discussed her absence at a J.O. Wilson staff meeting.

22.     On one of the first (February 16, 2007) or second (February 28, 2007) Fridays she was able to report to school, Ms. Williams was approached by a teacher who asked her why she

had volunteered for jury duty.  Tr. 26/8-25.  The teacher indicated that during a faculty meeting, Principal Warley announced that Ms. Williams had volunteered to serve as a juror.  *Id.*

23.    Ms. Williams was understandably surprised by the question and confused as to why Principal Warley would make such an announcement given that no one can volunteer for jury service.  Tr. 26/8-27/2.

24.    On February 22, 2007, Principal Warley called the Clerk of the Court to check on Ms. Williams, questioning why the Court would have a school counselor serve on a jury for an extended length of time.  Tr. 27/3-28/3; (6/25 a.m.) 11/7-11; Pl. Exh. 2.

25.    Principal Warley's attack on Ms. Williams' work ethic and integrity in front of the school staff again caused a change in Ms. Williams' working conditions in violation of the Juror Act.

**C.    Principal Warley Expressed Her Discontent for Jury Service to Another J.O. Wilson Employee**

26.    Principal Warley voiced her discontent for jury service and expressed her preference that her employees figure out ways to avoid serving.

27.    J.O. Wilson's building engineer, Lester Chance, was in the same jury pool as Ms. Williams.  Tr. 67/3-68/1.  After attending the second day of jury selection, Mr. Chance returned to J.O. Wilson where he mentioned to Principal Warley that he and Ms. Williams were in the same jury pool.  Tr. 68/2-24.

28.    For the next six business days Mr. Chance called the Court to see if he needed to return the following day.  Tr. 69/2-14.  During this six-day period, Mr. Chance had another conversation with Principal Warley about the fact that neither he nor Ms. Williams had been excused from jury duty.  *Id.*  After a week of calling, Mr. Chance was excused.  Tr. 69/6-16.

29.     Upon his return to school, Mr. Chance mentioned to Principal Warley that he was not chosen and Principal Warley responded by questioning how he got out of it.  Tr. 69/17-70/7. Principal Warley proceeded to ask why Ms. Williams was chosen and questioned why Ms. Williams had not done what Mr. Chance had done to get out of jury duty.  Tr. 70/8-16.

30.     Such actions by Principal Warley illustrate her attitude toward jury service and support Ms. Williams' contention that she was retaliated against by Principal Warley.

**D.     Routine Acts by Ms. Williams Suddenly Became Unacceptable to Principal Warley**

31.     When Principal Warley communicated with Ms. Williams while she was on jury duty, these contacts were arbitrary and made in a hostile way.

32.     It was well known to the personnel in the school's main office, including Principal Warley, that Ms. Williams stored her purse in the office secretary's desk drawer.  Tr. 28/4-30/13.

33.     Ms. Williams had stored her purse there for nearly thirteen years.  *Id.*

34.     On one of the Fridays she was able to report to work, Principal Warley questioned Ms. Williams as to why she was putting her purse in the drawer as she attempted to do so.  *Id.* Ms. Williams thought this was a strange question given that Principal Warley had seen her secure and retrieve her purse from the desk drawer on numerous occasions without complaint. *Id.*

35.     Ms. Williams explained that she did not have anywhere to lock her purse up, nevertheless, Principal Warley unapologetically told her she was not allowed to store her purse in the drawer anymore.  *Id.*

36.     This behavior intimidated Ms. Williams and changed, for the worse, the conditions under which she worked in violation of the Juror Act.

**E.      Principal Warley Attempted to Lower Ms. Williams' Performance Rating Because of her Absence from Work**

37.      On June 12, 2007, only days after completing her jury service and returning to work, Ms. Williams was asked to sign a performance evaluation conducted by Principal Warley despite the fact that Ms. Williams was not due to be evaluated for another year.  Tr. 30/24-31/17.

38.      The evaluation lowered her rating from "Exceeds Expectations" to "Meets Expectations."  Tr. 30/24-36/6.

39.      Ms. Williams immediately requested a meeting with Principal Warley to discuss the evaluation.  Tr. 31/9-32/9.  She got no response from the Principal until two days later.  Tr. 32/6-16.

40.      Two days later, Principal Warley burst into her office and said "you weren't here and I'm not going to do your work."  Tr. 32/6-16.  Ms. Williams explained that she had been at work only one-day per week and stayed late on those days to get work done.  Tr. 32/13-16. Principal Warley repeated that she was not going to do Ms. Williams' work for her.  *Id.*

41.      The evaluation was eventually voided by Principal Warley after she was contacted by the Teachers Union because she failed to follow proper procedures for conducting an evaluation.  Tr. 34/24-36/6; Pl. Exh. 5.

**1.      Principal Warley's Alleged Basis for Lowering Ms. Williams' Rating is a Red-Herring.**

42.      Principal Warley sought to justify her arbitrary lowering of Ms. Williams' performance rating by accusing her of failing to process certain referrals to the Student Support Team ("SST"), which Ms. Williams chaired.  Tr. 32/15-23.

43.      According to Principal Warley, DCPS psychologist Dr. Rebecca Harlan identified the processing problem, called DCPS Headquarters downtown and, as a result, a whole team of

people from the special education department came to the school to fix the problem.  Tr. 32/15-23; (6/25 p.m.) 54/21-55/9.

44.     No such events occurred.  Tr. (6/25 p.m.) 67/3-7.  Principal Warley's untimely evaluation of Ms. Williams was not about minor processing issues but was directly related to Ms. Williams' four month absence due to jury duty.

45.     A new procedure for SST processing caused Ms. Williams to have to redo some of the work she had already performed.  Ms. Williams previous practice was to include the student strategies with the other information in one document which the parents signed.  Tr. 37/2-39/18.  While on jury duty, Ms. Williams learned that the strategies had to be broken out into a separate document and that separate document needed to signed by the parents.  *Id.*  Over the course of several Fridays, Ms. Williams arranged to have the parents return to sign the new form (which contained the exact same information as the previous document they signed).  *Id.*

46.     Principal Warley told Ms. Williams there was a problem with the student referral folders, and that Principal Warley was not going to do her work for her.  Ms. Williams wanted to review the folders to see what work had been performed in her absence.  Tr. 32/24-34/18.  She reviewed the folders and discovered that the folders were exactly as she left them.  *Id.*

47.     Dr. Harlan's testimony contradicts the Principal's statement to Ms. Williams that Dr. Harlan told her that a team had to come fix the mess created by Ms. Williams.  Tr. (6/25 p.m.) 54/13-55/9.

48.     Dr. Harlan testified that it was not uncommon for her to go back to the SST to get information that was not included but was needed.  Tr. (6/25 p.m.) 65/8-66/21.  Dr. Harlan denied that anyone was sent from downtown to complete the SST work at J.O. Wilson.  Tr. (6/25 p.m.) 67/3-7.

49.     Dr. Harlan did indicate that some files were returned to the SST for additional information.  *Id.*  As she described the situation, "it was nothing that was significant" and had no effect on the work she had to do or on the SST process as a whole.  Tr. (6/25 p.m.) 67/15-68/11; (6/25 p.m.) 69/20-70/15.

> ### 2.    Any Failures Regarding SST Processing were Unfairly Blamed on Ms. Williams.

50.     The attempt to lower Ms. Williams' rating because of the alleged SST issues is inescapably tied to her jury service.

51.     Principal Warley did nothing to support Ms. Williams while she was away from school four-days-a-week, but she was ready to lower her rating within days of her full-time return to school.

52.     At the time of her testimony, Ms. Williams still did not fully know what the alleged problem was with SST referrals because she was never told there was a problem and was never given a chance to fix it.  Tr. 38/21-39/11.  Neither the Principal nor any teacher ever expressed to Ms. Williams that referrals to the SST had not been completed.  Tr. 49/19-51/2.

53.     Principal Warley never offered to provide any assistance to Ms. Williams in order to help her with her many duties while she was on jury duty and never assigned anyone to help her with the SST process or any other task Ms. Williams was required to perform.  Tr. 38/21-39/1; Tr. (6/25 p.m.) 36/6-37/21.  Nevertheless, as Principal Warley stated, Ms. Williams was expected to perform all of her duties as counselor, including SST work.  Tr. (6/25 p.m.) 36/6-37/21.

54.     Defendant alleged that Ms. Williams' processing failures occurred in 2006 – before her jury service – and that two teachers complained in March/April 2007 to Principal Warley about two incomplete referrals.  Tr. (6/25 p.m.) 48/5-49/14.  The fact that two teachers

waited four to seven months to raise the issue with Principal Warley and Principal Warley never communicated it to Ms. Williams, when she could have tried to do something about it during her one-day-a-week work schedule, calls into the question the legitimacy of this claim and just how important this issue was to Principal Warley at the time.  *Id.*

55.    Regina Weatherby, a teacher at J.O. Wilson, claimed that a referral she made in September 2006 was not processed by Ms. Williams.  Tr. 113/16-134/2.  This claim is dubious given the fact that, as claimed by Ms. Weathersby, the referral related to a sixth grader reading at a second grade level, yet Ms. Weathersby cannot recall ever following up with Ms. Williams regarding the referral.  Tr. 113/21-25.

56.    Principal Warley said the SST work was the most important part of Ms. Williams' job (Tr. (6/25 p.m. 37/11-21), yet she declared that it did not occur to her that Ms. Williams had only been working one-day-per-week and that she "didn't pay close attention to the SSTs."  Tr. (6/25 p.m.) 50/23-52/16.

57.    The SST process became important to Principal Warley only after she realized she had reporting duties related to SST processing statistics.  Tr. (6/25 p.m.) 52/17-54/11.  Because of Ms. Williams' absence and the total lack of support provided to Ms. Williams (even as little as communicating complaints or concerns), Principal Warley was faced with the fact that she was not going to be able to submit the statistics on time.  *Id.*

58.    Principal Warley perceived that the delay in filing her statistics would make her look bad with her supervisors and she took it out on Ms. Williams by declaring that "we are not going to do your work for you" and, ultimately, attempting to lower her rating.

59.    Principal Warley claimed she lowered the ratings of two teachers in addition to Ms. Williams because of SST failures.  Tr. (6/25 p.m.) 49/15-50/22.  Despite this claim,

Principal Warley admitted that neither teacher actually had their rating category downgraded.  *Id.*
Only Ms. Williams received enough of a numerical lowering of her score to cause her category
rating to drop from "Exceeds Expectation" to "Meets Expectation."  *Id.*

60.     Principal Warley went out of her way to lower the rating of Ms. Williams within
days of the end of the school year even though she knew for months that Ms. Williams had been
excessed and would not be returning to J.O. Wilson in the Fall.  Tr. (6/25 p.m.) 46/10-47/8.

61.     Ms. Williams successfully processed more than twice as many SST referrals in
the 2007-2008 school year at Seaton Elementary.  Tr. 36/9-23.  This success formed the basis for
the exceeds expectations rating she received at Seaton.  *Id.*

62.     Principal Warley's put Ms. Williams in an impossible position because of the
total lack of support provided to her while she was serving.

63.     Principal Warley attempted to lower Ms. Williams rating in retaliation for the fact
that she believed J.O. Wilson's SST statistics would make her look bad to her supervisors.

**F.     Principal Warley Engineered the Excessing of Ms. Williams Because of Her
        Jury Duty**

64.     While Ms. Williams was serving on the jury, the J.O. Wilson Local School
Restructuring Team ("LSRT") was meeting to discuss the next year's budget and the need to cut
staff to meet the projected budget.  Pl. Exhs. 8 and 10.  Local School Restructuring Teams are
intended to be made up of school personnel and community members who are supposed to work
together to make decisions that are in the best interest of the school.  Tr. 80/3-12.  LSRT
recommendations are made to the principal but the principal has ultimate decision-making
authority.  Tr. 115/10-12.

65.     LSRT's meet periodically and, when a quorum is met, can come to consensus as
to what recommendations to make regarding the school plan, including staffing.  Pl. Exh. 6.  If

the LSRT recommends reductions in staffing and the recommendation is followed, the affected

staff member is declared excess to the school's needs.  Tr. 100/12-16.  Excessed teachers and

counselors are then reassigned to other schools based on their seniority.  Pl. Exh. 17, pp. 15-17.

If they are not reassigned, they are terminated.  *Id.*

66.     Excessed personnel are supposed to be informed of their excessing by letter

received at the school before the end of the school year.  *Id.* at p. 15.

67.     The J.O. Wilson LSRT voted unanimously on February 28, 2007 to recommend

that Ms. Williams, and only Ms. Williams, be excessed for the following school year.  Exh. 10.

68.     The LSRT was never properly constituted, lacked independence and was directed,

not by the chairperson, but by Principal Warley.  Principal Warley used the LSRT to accomplish

her goal of ridding herself of Ms. Williams.

### 1.     The 2006-2007 J.O. Wilson LSRT Was Never Properly Constituted.

69.     A properly constituted LSRT in 2006-2007 was supposed to be made up of the

following representatives:  one principal; one building representative; four teachers; four parents;

one support staff; and one community representative.  Pl. Exh. 6; Tr. 83/9-16.  J.O. Wilson's

LSRT lacked several of these representatives and was never properly constituted according to

DCPS guidelines.  Pl. Exh. 6.

70.     Neither the Principal nor the LSRT Chairperson, Regina Weathersby, could

consistently identify all of the members of the LSRT and their positions.  Tr. 83/9-84/16; (6/25

a.m.) 42/20-53/1; (6/25 a.m.) 61/5-14.

71.     The LSRT lacked two of the four required parents and the community

representative.  *Id.*; Pl. Exh. 23.

### 2.    The J.O. Wilson LSRT Intentionally Excluded Independent Members from Participating.

72.    Two parents were identified as being members of the LSRT for 2006-2007 – Ms. Hall and Ms. Holder.  Pl. Exh. 23; Tr. 83/24-84/8; (6/25 a.m.) 61/5-14; (6/25 p.m.) 21/3-22/1.

73.    These parent representatives only served as window dressing for Principal Warley and the LSRT because they did not participate at all.  In the case of Ms. Holder, her lack of participation was the result of never being invited or informed of meetings.  Tr. 62/21-63/4.

74.    Principal Warley provided contradictory testimony regarding the involvement of parents and the community.  She testified that in her experience it is virtually impossible to get community involvement in the school so she did not bother to solicit parental input for the LSRT.  Tr. (6/25 a.m.) 44/6-22.  Yet she went out of her way to personally ask Ms. Holder to be a member of the LSRT.  Tr. 61/24-62/16.

75.    Ms. Holder agreed to be a member and was never invited to attend any meetings. Tr. 62/21-63/4.  It is likely that Ms. Hall had a similar experience.

76.    The charade of parental involvement went so far as to result in the forged signature of Ms. Holder on a document indicating that all LSRT members had reviewed the Final School Plan and Budget developed by Principal Warley and the LSRT.  Pl. Exh. 23; Tr. 63/5-65/9.

77.    Ms. Holder had never seen the Plan and Budget document and never saw the document she supposedly signed acknowledging that she had reviewed it.  *Id.*  Ms. Holder's name is misspelled on the document and her purported signature mimics the misspelling.  *Id.*

78.    Behind the façade of independence was a body that was made up entirely of employees of J.O. Wilson who worked for Principal Warley.  Tr. 131/5-132/1.

79.    The Chairperson of the LSRT, Ms. Weathersby, was subordinate to the Principal. Ms. Weathersby did not know that parents had to be informed of meetings; did not know that it was her responsibility to set-up meetings and set the agendas; and was not aware that a quorum was required for actions to be taken.  Tr. 84/17-85/23; 86/10-88/19.  All of these responsibilities were ceded to Principal Warley.  Tr. 86/17-87/25.

80.    The minutes from the meetings involving Ms. Williams reveal that it was Principal Warley, not the Chairperson, who directed the meetings.  Tr. 91/14-93/18; Pl. Exhs. 8 and 10.

### 3.    The LSRT's Recommendation to Excess Ms. Williams was not Valid Because the Quorum Requirement was not Met.

81.    No effort was made by the LSRT to ensure that the recommendation to excess Ms. Williams was made in accordance with the guidelines governing the LSRT.  Not inviting parents to the meetings not only affected the independence of the LSRT but also caused the LSRT to be unable to satisfy the quorum requirements.  Pl. Exh. 6 at p. 22.

82.    The requirement was that a majority of the required 13 members (this LSRT only had 10 named members), which must include the principal or designee, building representative or designee, and at least one parent representative, will constitute a quorum.  *Id.*

83.    The only person in attendance that was a parent of a child in the school was Shawn Smith and Principal Warley clearly stated that Ms. Smith filled a teacher, not a parent, position on the LSRT.  Pl. Exh. 10; Tr. (6/25 p.m.) 21/3-22/1.

84.    No quorum existed at the February 28, 2007 LSRT meeting.

### 4.   The LSRT Process was Cloaked in Secrecy Despite the Requirement that it be Open to the Public.

85.     The meetings of the LSRT were never open to the public contrary to the guidelines.  Tr. 87/11-88/5; 95/19-97/12; 101/20-107/16.

86.     The minutes from each meeting were never made available to the public, contrary to the guideline requirements.  Pl. Exh. 6; Tr. 88/6-19.

87.     At the end of each meeting Principal Warley reminded each member that they were sworn to secrecy.  Pl. Exh. 7-8, 12 and 14.  No one on the LSRT noticed the conflict between the oath of secrecy and the requirement that the minutes be posted for public viewing.  Tr. 90/17-21.  The LSRT members chose to heed Principal Warley's warning.  Pl. Exhs. 7-8, 12 and 14.

88.     Principal Warley told Marion Lomax-Scott (former J.O. Wilson Business Manager) that she thought someone on the LSRT told Ms. Williams that she had been excessed and, if she found out who it was, they could lose their job.  Tr. (6/25 p.m.) 79/1-4.

89.     Ms. Williams was not told by Principal Warley or anyone else prior to the last day of school that she had been excessed as was required under the Teachers' Union Collective Bargaining Agreement.  Tr. 40/2-42/15; Pl. Exh. 17.

90.     In prior years, excessed J.O. Wilson employees were presented with, and signed for, their excessing letters at school prior to the last day of school.  Tr. 40/2-41/17; 73/11-75/22.

91.     Ms. Williams did not know that she had been excessed until she got a call during the Summer break that she was invited to a job fair for excessed teachers.  Tr. 41/20-43/1.  Ms. Williams found out a week before the next school year began that she had been assigned to Seaton Elementary, a school she knew nothing about, and to a principal who knew nothing about her.  Tr. 43/18-45/14.

**5.     Principal Warley Left the LSRT with No Choice but to Excess Ms. Williams.**

92.     The minutes from the February 28, 2007 meeting, at which it was a unanimous vote to excess Ms. Williams, are clear that the only position up for a vote was the counselor's position.  Pl. Exh. 10.

93.     Principal Warley directed the February 28, 2007 meeting, identified positions that could not be touched and gave the Committee the task of determining who on staff could do the counselor's jobs.  *Id.*; Tr. 97/11-101/7.

94.     The only position left on the table for a vote at the February 28, 2007 meeting was the counselor's position, so Ms. Williams' fate was sealed by Principal Warley.  Tr. 100/17-101/7; Pl. Exh. 10.

**6.     The Excessing Took a Personal and Professional Toll on Ms. Williams.**

95.     Ms. Williams spent a third of her life at J.O. Wilson, developing friendships within the school and the community.  Tr. 44/17-45/4.  For her, it was like losing a second family.  *Id.*

96.     Ms. Williams was forced to leave behind many of the programs that she had established and cared for, including the FBI Special Agent program, peer mentoring program, intergenerational program and parent workshops.  Tr. 14/9-15/17.

97.     Ms. Williams suffered from elevated blood pressure for a month after learning of her excessing and her hair started falling out.  Tr. 44/17-24.

98.     Ms. Williams lost twenty years of building seniority she had built up.  Tr. 59/8-12.  Under the Collective Bargaining Agreement, an employee with more building seniority has

advantages regarding involuntary transfers and excessing over less senior employees.  Pl. Exh. 17 pp. 14-17.

99.    Ms. Williams considered giving up and retiring but instead decided to fight what she perceived as an injustice so that no one else would have to go through what she went through.  Tr. 45/7-22.

100.    Ms. Williams' decision to carry-on at Seaton meant she would have to report to work with the stigma of being excessed.  Excessed employees are viewed as being poor performers and not wanted.  Tr. 44/2-44/12.

101.    Ms. Williams was "dumped" on Seaton's new principal a week before school opened.  Tr. 44/7-14.  She had never met with the principal and never interviewed for the job. *Id.*

102.    It was embarrassing and humiliating for Ms. Williams to be viewed in that way after twenty years of dedicated service to the public school children of Washington, D.C.  Tr. 44/17-45/14.

103.    The evidence supports the conclusion that Ms. Williams was excessed, the ultimate change in working condition, because of Principal Warley's displeasure with her jury service.  Thus, the excessing is yet another violation of the Juror Act.

### III.    PRINCIPAL WARLEY HAS A CREDIBILITY PROBLEM

104.    The testimony of Defendant's primary witness, Principal Warley, is simply not credible.  Unlike all of the other witnesses, Principal Warley is the only witness with an admitted propensity for telling untruths and is the only witness who peddles in forged documents.

A. **Principal Warley Denied that Her Relationship with Ms. Williams was Anything other than Wonderful**

105. Ms. Williams testified extensively about how her previously good working relationship with Principal Warley changed abruptly when she began jury duty. *See supra* § II(A). Ms. Williams explained how Principal Warley stopped speaking to her and avoided her when she needed to speak with the Principal. *Id.* According to Principal Warley, none of this is true. Tr. (6/25 p.m.) 11/7-12; (6/25 p.m.) 56/16-18.

106. In Principal Warley's view, there were never any conflicts or changes in what was a "wonderful" relationship. *Id.*

107. The facts suggest otherwise, for example, this relationship was so wonderful that Principal Warley: (1) called the Clerk of the Court to check to see if Ms. Williams really was on jury duty; (2) tried to untimely lower Ms. Williams' rating because she was not going to do her work for her; (3) had Ms. Williams declared excess; (4) refused to allow Ms. Williams to store her purse in the main office; and (5) announced to the staff that Ms. Williams had volunteered for jury duty. *See supra* § II. Principal Warley is not credible when she claimed she had an unwaveringly wonderful relationship with Ms. Williams.

108. Principal Warley denied she ever told the staff that Ms. Williams volunteered for jury duty. Tr. (6/25 p.m.) 56/11-15.

109. After being confronted by a teacher about Principal Warley's comment, Ms. Williams was so concerned that she immediately brought her concerns to the attention of the Clerk of the Court. Tr. 26/8-28/3. It was then that she learned that Principal Warley had called the Clerk to check on Ms. Williams' jury service. *Id.*

110. Principal Warley denied she ever spoke to Mr. Williams about storing her purse in the main office of the school. Tr. (6/25 p.m.) 11/25-12/5. Principal Warley denied even

knowing that Ms. Williams stored her purse in the school's main office, where the Principal's

office is located, even though Ms. Williams had been doing so from the first day Principal

Warley came to J.O. Wilson.  Tr. (6/25 p.m.) 55/10-14.

**B.    Principal Warley's Claimed Lack of Knowledge Regarding Ms. Williams' Jury Service is not Credible**

111.    Principal Warley claimed she had no knowledge of Ms. Williams' jury duty

during the first two weeks of Ms. Williams' service and assumed she was out sick.  Tr. (6/25

p.m.) 29/5-10.

112.    Principal Warley initially claimed that Ms. Williams never submitted the

Summons (Pl. Exh. 1) to her secretary.  Tr. (6/25 p.m.) 29/20-24.

113.    When confronted with clear evidence that the Summons came from J.O. Wilson's

files and was not part of the documentation faxed to her by the Court on February 22nd, Principal

Warley changed her story.  Tr. (6/25 p.m.) 31/20-32/10.

114.    Principal Warley acknowledged that the Summons was submitted to her secretary

but claimed that her secretary told her that she did not have the Summons when Principal Warley

inquired.  Tr. (6/25 p.m.) 31/20-32/10.

115.    Ms. Williams' testimony that she called Principal Warley at home on the night of

February 7th to tell her she had been selected for a jury expected to sit for four months went

unchallenged.  Tr. 20/16-25.

116.    Principal Warley's claim that she thought Ms. Williams was out sick is not

believable, even ignoring the evidence that she knew otherwise.

117.    Principal Warley claimed that she never inquired as to why Ms. Williams was out

of the office for two weeks, never asked anyone how she was doing, what was wrong with her or

whether she was in the hospital.  Tr. (6/25 p.m.) 29/5-19.

118.    All Principal Warley would have had to do was to look at the Sign-In/Sign-Out log maintained in the main office and it would have shown that Ms. Williams was absent because of jury duty.  Pl. Exh. 3.  Principal Warley never bothered to check.  Tr. (6/25 p.m.) 33/5-13.

119.    Principal Warley knew from the outset that Ms. Williams was on extended jury duty.

120.    Her attempts to deny this knowledge demonstrate a lack of credibility and exposes the fact that Principal Warley attempted to cast Ms. Williams as an irresponsible employee who would just disappear for weeks at a time without informing her employer.

### C.    Principal Warley's Recollection of Her Conversations with Lester Chance Regarding Ms. Williams' Jury Service Is Not Trustworthy

121.    Principal Warley's recollection regarding her conversations with Lester Chance regarding Ms. Williams' jury service completely contradicts Mr. Chance's testimony relating to these conversations.

122.    Mr. Chance testified that during the first week of jury selection he had a conversation with Principal Warley in which he mentioned that neither he nor Ms. Williams had been excused.  Tr. 69/2-14.  After calling the Court each day for six days to see if he had been chosen, Mr. Chance found out that he had been released.  Tr. 69/17-70/16.  Shortly thereafter, he mentioned to Principal Warley that he was not chosen and Principal Warley said, what did you do, why weren't you chosen and why didn't Ms. Williams do what [Mr. Chance] did.  *Id.*

123.    Principal Warley's contradicted this testimony, stating that Mr. Chance told her that he and Ms. Williams were both released.  Tr. (6/25 p.m.) 34/20-25.  Principal Warley claimed to have told Mr. Chance that she thought Ms. Williams was still serving during this conversation.  *Id.*

124.    Principal Warley's testimony does not make sense in light of her testimony that she thought Ms. Williams was out sick for the first two weeks of her jury duty.  Mr. Chance was released from jury duty during that two week period.  Tr. 67/9-69/14.

125.    If Principal Warley really thought Ms. Williams was out sick, she could not have told Mr. Chance that she thought Ms. Williams was still on jury duty.

126.    Principal Warley offered this version of events in an attempt to refute Mr. Chance's testimony regarding her disdain for jury service, but, in so doing, the continuity of her story broke down.

### D.    Principal Warley Contradicted Ms. Lomax-Scott's Testimony on Every Important Point

127.    Marion Lomax-Scott's testimony was completely contradicted by Principal Warley.

128.    Ms. Lomax-Scott testified that, on multiple occasions, Principal Warley would ask her if Ms. Williams was going to retire so she could put Ms. Zachery in the counselor's position.  Tr. (6/25 p.m.) 73/8-24.  Principal Warley denied she ever made such statements.  Tr. (6/25 p.m.) 38/5-16.

129.    Ms. Lomax-Scott testified that Principal Warley told her to go downtown because she needed to check on her job.  Tr. (6/25 p.m.) 79/15-80/13.  Principal Warley claimed Ms. Lomax-Scott was just on an errand downtown when she learned she had been excessed.  Tr. (6/25 p.m.) 4/4-19.

130.    Ms. Lomax-Scott testified that during a chance run-in with Principal Warley in a Wal-Mart parking lot, Principal Warley told her that Ms. Williams had been excessed, that someone on the LSRT told Ms. Williams about it and if she found out who it was, they could

lose their job.  Tr. (6/25 p.m.) 78/18-79/13.  Principal Warley denied discussing the excessing of Ms. Williams at all during this encounter.  Tr. (6/25 p.m.) 45/12-46/9.

131.     Principal Warley denied ever creating a false document under the name of one of her employees or forging (or having someone forge) one of her employees names on a document. Tr. (6/25 p.m.) 57/4-15.

132.     Ms. Lomax-Scott testified about a fictitious letter purported to have been written and signed by her on behalf of Principal Warley.  Tr. (6/25 p.m.) 74/3-78/17; Pl. Exh. 24.  The letter, written exclusively for Principal Warley's benefit, does not contain a single truthful statement and was not written or signed by Ms. Lomax-Scott.  *Id.*

133.     Principal Warley urged Ms. Lomax-Scott to go along with the lies in the letter if anyone called to verify the information.  *Id.*  Ms. Lomax-Scott refused to do so.  Tr. (6/25 p.m.) 77/8-22.

134.     The fact that such a letter was written and sent calls into question Principal Warley's honesty and trustworthiness.

## IV.     CONCLUSION

135.      Defendant violated the Juror Act by intimidating, coercing and changing the working conditions of Ms. Williams by reason of her jury service.

136.     Ms. Williams is entitled, and should be given the choice of whether she wants, to be reinstated to her position as guidance counselor at J.O. Wilson and Defendant shall be enjoined from further violations.

137.    Defendant is subject to a civil fine for each violation and should pay attorneys

fees and expenses incurred on behalf of Ms. Williams.

Date:  August 29, 2008                          Respectfully submitted,

                                                 _/s/ Gregory S. Kaufman_____
                                                 Gregory S. Kaufman (D.C. Bar No. 464208)
                                                 Kerry B. Verdi (D.C. Bar No. 478486)
                                                 Sutherland Asbill & Brennan LLP
                                                 1275 Pennsylvania Ave., NW
                                                 Washington, D.C. 20004
                                                 Tel. No. (202) 383-0100
                                                 Fax No. (202) 637-3593