UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LILLIANN WILLIAMS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Misc. Action No. 07-505 (RMC) |
| DISTRICT OF COLUMBIA, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

Sitting as a juror on a lengthy, difficult, capital case is one of the most challenging, but absolutely critical, civic duties of all citizens. A life is literally in the jury's hands if they find the defendant guilty as charged. The resulting absence from work can aggravate employers and fellow employees. But everyone knows that a juror's job is protected during her absence, right?

LilliAnn Williams-Jackson, Ph.D ("Dr. Jackson") sues the District of Columbia pursuant to the Jury Systems Improvement Act ("Juror Act"), 28 U.S.C. § 1875, alleging that she lost her position as guidance counsel at J.O. Wilson public elementary school in the District of Columbia because her principal was angry that Dr. Jackson served for over four months on a federal jury in a capital case. After a two-day trial and post-trial briefs, the Court took the matter under advisement. This is a close case of mixed motives leading to the decision to "excess" Dr. Jackson from Wilson and one in which Dr. Jackson's credibility is distinctly superior to her former principal. Nonetheless, the Court concludes that Dr. Jackson has not carried her burden to prove that her jury service "was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin.*

*Servs.*, 129 S. Ct. 2343, 2352 (2009).

## I. FACTS

Dr. Jackson worked at J.O. Wilson Elementary School for over twenty years, as a teacher from 1987 to 1996 and as the guidance counsel from 1996 to June 2007. She holds a PhD from Michigan State University. Tr. at 13, June 24, 2008 a.m. (Jackson).[1] Cheryl Warley was the principal at J.O. Wilson after 2002. *Id.* at 15.

### A. Jury Duty

Dr. Jackson received a summons for a jury trial in December 2006, immediately reported it to Ms. Warley, and reported for jury selection in early January 2007 in *United States v. Gooch*, Crim. Action No. 04-128 (RMC). *Id.* at 19. She completed a questionnaire, which explained, *inter alia*, that the jury would be sitting on a capital case in which the defendant might face the death penalty. *Id.* Thereafter, Dr. Jackson was recalled and seated on the jury. Trial began on February 7, 2007. As soon as she got home on the evening of February 7, Dr. Jackson called the school to tell Ms. Warley that she had been seated on the jury but Ms. Warley had already left for the day. *Id.* at 20. Dr. Jackson called Ms. Warley at home and notified her that she had been selected to serve on the jury. *Id.* Dr. Jackson advised Ms. Warley that the trial was "expected to last anywhere between four and six months" and that Dr. Jackson "would serve on Monday through Thursday" and "would be in the building on Fridays." *Id.*

Ms. Warley made it clear that she was unhappy with Dr. Jackson's absence. Where they once had had a cordial professional relationship, Ms. Worley essentially stopped speaking to

---

[1] This matter was tried to the Court on June 24 and 25, 2008. Because of different court reporters transcribing the trial, the morning and afternoon transcripts from June 24 are not numbered sequentially.

Dr. Jackson. *Id.* at 16 ("Ms. Warley stopped speaking to me. I would speak to her, she would not speak to me. . . . She would look right at me and not acknowledge me."). During a faculty meeting, Ms. Warley announced that Dr. Jackson had volunteered to serve on the jury, suggesting she was not dedicated to her job. *Id.* at 26. Ms. Warley also called this Court's Jury Office to find out if Dr. Jackson were really on jury duty and, if so, why was it taking so long. *Id.* at 27-28. This conduct sank to a very petty level when Ms. Warley told Dr. Jackson that she could no longer store her purse in the school office, which, without a locked cabinet in her office, Dr. Jackson had been doing for twelve or thirteen years. *Id.* at 28-30.[2]

The *Gooch* trial ended in June of 2007 and Dr. Jackson returned to J.O. Wilson full-time. To her surprise, upon her return, she was handed a performance appraisal, which was premature. "Based on the Washington Teachers Union guidelines if you receive an[] exceed[s] expectation[s] rating, you are only required to be evaluated every three years," and Dr. Jackson had been rated "exceeds expectations" in an evaluation for the school year 2005-2006. *Id.* at 17-18. After her jury service, however, she unexpectedly received a performance evaluation with a lower rating. *Id.* at 31. She asked to speak with Ms. Warley and was ignored for a few days until "Ms. Warley just burst in [to Dr. Jackson's office] and said you weren't here and I'm not going to do your work." *Id.* at 32. Ms. Warley then complained "that there w[ere] some SSTs[3] that had not been

---

[2] Ms. Warley contends that none of the facts recited in this paragraph are true, except for her call to the Jury Office. That is, she admits to a cordial relationship with Dr. Jackson before the *Gooch* jury was seated but denies that her behavior changed in any way, denies that she told the other teachers that Dr. Jackson had "volunteered" to serve on such a long jury, and denies that she instructed Dr. Jackson to keep her purse in her office. For reasons explained later in this decision, the Court does not credit Ms. Warley's denials.

[3] An "SST" is a Student Support Team comprised of parents, teachers, and Dr. Jackson to address academic, behavioral, or other problems a student may be having at school.

processed properly and that Dr. Harlan who is the school psychologist on the multi disciplinary team had called downtown and said that there was a problem and the whole team had come from the special education department to J.O. Wilson to fix this problem." *Id.* Ms. Warley refused to retract or change the evaluation. *Id.* at 33.

However, when Dr. Jackson re-checked the students' folders that had supposedly been changed, she could find no changes. *Id.* at 34 ("I didn't see any new information, any of my information that had been revised or anything."). Upon Dr. Jackson's complaint, a Union representative contacted Ms. Warley who then changed the performance evaluation and gave a copy to Dr. Jackson.

> [T]he next thing I know Ms. Warley called me on the telephone. She was in the main office. I was in my office. And she said do you want me to shred this evaluation or do you want it? And I said I'll come up to the main office. I want it.
>
> And when I got up there, it wasn't the original evaluation that Mrs. Johnson had presented to me . . . . That one was a three page carbonless one, but the one Ms. Warley was presenting to me was like a computer generated one. Just one single sheet. And where it had meets expectation[s], she scratched that, then she put an X over by exceeds expectation[s].
>
> So I asked Ms. Warley, where is the evaluation that was presented at first? This is not the one. And she said this is the one. I said this is not the one. And she said it is.
>
> And I said you have marked two places here, how would anyone know which one is the correct evaluation? There was a check marked between in front of [sic] exceeds expectation[s] and a check mark in front of meets expectation[s]. So then she just very hurriedly wrote void on it and dated it and signed her name.
>
> And I was given that.

*Id.* at 34-35; *see* Pl.'s Ex. 5 (Voided Evaluation of LilliAnn Williams). In discovery, Defendants

said that the way Dr. Jackson had prepared the SSTs had been a problem. Dr. Jackson "still do[esn't] see what the problem is. . . . I've always done the SSTs the same. I did the 30 SSTs at the new school the same way. I've not gotten any returns or any discussion about anything not done correctly on them." Tr. at 39, June 24, 2008 a.m.

### B. "Excessing" Decision

Under the Washington Teachers Union collective bargaining agreement, there is a procedure to "excess" a teacher, that is, "an involuntary transfer of an employee from one site to another site." *Id.* at 40. Each public school in the District of Columbia has a Local School Restructuring Team ("LSRT"). Due to budget limitations, the LSRT at J.O. Wilson recommended that the guidance counselor position at the school be excessed in March 2007, while Dr. Jackson was on jury duty, and the D.C. Public School System ("DCPS") adopted that recommendation. *Id.* at 52-53. Under the collective bargaining agreement, a teacher can request a waiver if she presents "a defensible explanation why excessing him or her would result in a detriment or hardship to the mission of the school and a school improvement plan." *Id.* at 54-55 (Defs.' Att'y (Saindon), quoting Pl.'s Ex. 15 (Excess Teacher Memorandum) at 15, Article IV, § C, ¶ 5). Dr. Jackson never requested a waiver. Tr. at 55, June 24, 2008 a.m (Jackson). However, if Ms. Warley had successfully lowered Dr. Jackson's performance rating, Dr. Jackson would not have been eligible even to request a waiver. *Id.* at 59.

The function of an LSRT is "to work together, collaborate to make decisions for the school." *Id.* at 80 (Weatherby). Under DCPS policy, the representatives on an LSRT are to be the "principal or school administrative leader, the building rep, four teachers, four parents, one support staff, one community representative and one student at the high school level optional." *Id.* at 83

(Weathersby, quoting Pl.'s Ex. 6 (LSRT Planning Process Slides)).  During the 2006-2007 school year, Regina Coates Weathersby, a classroom teacher, was the chair of the LSRT at J.O. Wilson. Tr. at 83, June 24, 2008 a.m.  Ms. Weathersby considers Principal Warley a mentor. *Id.* at 79 (Weathersby).  Ms. Weathersby testified that "99 percent of the time whatever we say as a team or vote on, that's what goes." *Id.* at 82; *but see* Pl.'s Ex. 6 (LSRT Planning Process Slides) at 83 ("The LSRT shall serve in an advisory capacity to the principal for the purpose of improving student outcomes.").

Tammy Holder, whose granddaughter attended the school, Tr. at 60, June 24, 2008 a.m. (Holder), was asked by Ms. Warley to serve as the parent member of the LSRT, but Ms. Holder was never invited to attend committee meetings, never received an agenda for any meeting, never received any minutes from meetings, and never received any materials concerning the LSRT during the 2006-2007 school year. *Id.* at 62-63.  She was listed in the document that contained the formal Local School Restructuring Team S[chool]Y[ear] 2006-2007 as the parent member and appeared to have signed that document. *Id.* at 63.  Her signature was, however, forged, which was clear because the forger spelled her name "Tamie" instead of "Tammy," which is Ms. Holder's first name. *Id.* at 64; *see* Pl.'s Ex. 23 (Roster of LSRT Members for SY 2006-2007).

A quorum of the LSRT required the principal or designee, the building rep or designee, at least one parent and a majority of the members.  Tr. at 85, June 24, 2008 a.m. (Weathersby).  Although chair of the LSRT, Ms. Weathersby was unaware of the necessity of a quorum and never ensured that the requirement was met. *Id.*  She was also unaware of her specific responsibility to notify all members, including those not in the school, of meetings. *Id.* at 86 ("The chairperson has the responsibility to set a meeting agenda and provide notice of meetings to all

members."). Instead, a meeting was set when she "got notice either through a memo or by word of mouth going someone calls you to the office and getting it." *Id.* Not surprisingly, Ms. Weathersby was able to identify only the in-school members of the 2006-2007 LRST at J.O. Wilson. *Id.* at 83-84.

The LSRT at J.O. Wilson met on February 27, 2007. The "parent representative" present was Shawn Smith who is also a teacher at J.O. Wilson. One issue under discussion was the budget for the 2007-2008 school year. *Id.* at 92. The LSRT had erred in its budgeting for 2006-2007, so it was "held accountable and [the school] had to lose members because of the deficit." *Id.; see also id.* at 95 ("We had a deficit over a hundred thousand dollars I think it was that year. And we were going to have to lose staff. There was no way to not . . . ."); *id.* at 121 ("The year prior we had errors in which we lost, I know it was four, five people because there was an error. The business manager made an error in the numbers and it went through but then they went back in August or September to look at it, we were in the red by a lot and we had to fix it so we did not want that to happen again."). The LSRT met again on February 28, 2007, to discuss suggestions for staff reductions. *Id.* at 95; Pl.'s Ex. 9 (2/28/07 LSRT Meeting Agenda). Again, the only "parent representative" was teacher Shawn Smith. Tr. at 96, June 24, 2008 a.m. (Weathersby). There were no community representatives at either meeting. *Id.*

Ms. Warley opened the meeting and told the LSRT members that the front office could not afford to excess the school secretary, who alone remained in that office, or any custodians, who had a different union contract. The committee discussed the computer lab coordinator and decided the position needed to be retained because "at that time DCPS had a horrible IT team and it would take weeks, months for someone to come out and he could troubleshoot on the spot." *Id.*

at 98. No teachers' aide would be cut because their salaries were so low that it would take a lot of them, not just one or two, to make up the deficit. *Id.* at 99. It was also determined, for unspecified reasons, that the special education coordinator and instructional facilitator positions could not be excessed. Then "'[t]he committee was given the task by [Ms.] Warley to discuss tasks of counselor and who on staff could complete those tasks.'" Pl.'s Ex. 10 (2/28/07 LSRT Meeting Minutes). At the end of the meeting, the LSRT voted to abolish Dr. Jackson's position and move money from other spots to make up the deficit. Tr. at 100, June 24, 2008 a.m. (Weathersby). "[W]e eliminated the other ones through discussion. And but not [sic] necessarily a vote. But it was through discussion and a consensus, agreed on the other positions." *Id.*

The LSRT met on March 6 and 7, 2007, *sans* parent/teacher Smith or a quorum, and finalized the budget for the next school year. *Id.* at 103-106. A signature sheet that "indicate[d] review of the final local school planning budget" was executed by each LSRT member at some unspecified time(s). *Id.* p. 107; *see* Pl.'s Ex. 23. Amazingly, signatures were affixed from the parent members of the LSRT and Ms. Holder, none of whom had participated in the meetings or budget discussions. Tr. at 108, June 24, 2008 a.m. (Weathersby).

The process of excessing teachers at J.O. Wilson was not new. In the years between 2005 and 2007, budget reductions caused the school to excess the counselor (Dr. Jackson), the math resource teacher, two Special Education teachers, the business manager and the data entry clerk, if not more. *Id.* at 116.

A teacher who is being excessed is "suppose[d] to be notified on or before the close of school." *Id.* at 40 (Jackson). No one told Dr. Jackson that she had been excessed from J.O. Wilson. *Id.* at 41. Instead, during summer vacation, she received a call and "the person said I'm

calling to tell you to go to a job fair." *Id.*

> I said I think you have the wrong number. She said is this LilliAnn Williams? I said yes. She said I'm telling you to go to a job fair on July the 9th at Randall Highlands.
>
> I said why would I be going to a job fair? She said were you at school the last day? I said yeah, I was at school. She said well, you were excessed. And I said excessed? She said yes.
>
> I said well, when did this happen? She said they took this to the round table in March, beginning of March.

*Id.* Dr. Jackson was reassigned to Seaton Elementary School just before school began in September. *Id.* at 43; *see* Pl.'s Ex. 16 (Reassignment Letter to LilliAnn Williams). She receives the same pay and benefits and enjoys the same overall seniority, Tr. at 45, June 24, 2008 a.m. (Jackson), except that she lost her 20-year building seniority at J.O. Wilson and, at the time of the hearing, had only one year's building seniority at Seaton. *Id.* at 58. As a result of being excessed, Dr. Jackson was "embarrassed and humiliated;" her "blood pressure just shot up" and the doctor "just couldn't get that under control for about a month;" she felt "so much stress my hair started coming out." *Id.* at 44.

## II. APPLICABLE LAW

The Juror Act provides, in relevant part, that:

(a) No employer shall discharge, threaten to discharge, intimidate, or coerce any permanent employee by reason of such employee's jury service, or the attendance or scheduled attendance in connection with such service, in any court of the United States.

(b) Any employer who violates the provisions of this section –

> (1) shall be liable for damages for any loss of wages or other benefits suffered by an employee by reason of such violation;

>   (2) may be enjoined from further violations of this section and ordered to provide other appropriate relief, including but not limited to the reinstatement of any employee discharged by reason of his jury service; and
>
>   (3) shall be subject to a civil penalty of not more than $5,000 for each violation as to each employee. . . .
>
> (d)(1) An individual claiming that his employer has violated the provisions of [the Juror Act] may make application to the district court for the district in which such employer maintains a place of business and the court shall, upon finding probable merit in such claim, appoint counsel to represent such individual in any action in the district court necessary to the resolution of such claim. . . .
>
>   (2) . . . [t]he court may award a prevailing employee who brings such action by retained counsel a reasonable attorney's fee as part of the costs. The court may tax a defendant employer, as costs payable to the court, the attorneys fees and expenses incurred on behalf of a prevailing employee, where such costs were expended by the court pursuant to paragraph (1) of this subsection. . . .

28 U.S.C. § 1875.

### III. ANALYSIS

As the finder of fact, the Court found Ms. Warley a very unconvincing witness. She clearly dissembled on the stand, painted Dr. Jackson in a very harsh light entirely inconsistent with her insistence that their cordial relationship had never changed, and simply denied that anything testified to by Dr. Jackson was true. Yet, she could not recall important facts and her antagonism was palpable, causing great skepticism as to the accuracy of her testimony. The episodes of the voided performance appraisal and the failure to notify Dr. Jackson on a timely basis of her excessing spoke volumes about Ms. Warley's anger that Dr. Jackson had been away on jury duty.

However, it is clear that Wilson needed to reduce its staff in the spring of 2007 and that its options were few. The LSRT was improperly constituted and lacked a quorum at its March

2007 meeting, but those flaws speak to the difficult scope of a principal's job and lack any evidentiary tie to Dr. Jackson's jury service. Ms. Weathersby might view Ms. Warley as a "mentor," but her description of the difficult decisions on staffing levels, made each spring by the LSRT, tied those decisions firmly to a reduced budget and not to Ms. Warley's direction. Dr. Jackson seeks to connect, by inference, Ms. Weathersby's clear admiration of Ms. Warley, Ms. Warley's clear anger at Dr. Jackson, and the LSRT's consensus decision to excess the guidance counselor position.

This desired leap of logic is insufficient to prove the case. "Unlike Title VII, [the Juror Act's] text does not provide that a plaintiff may establish discrimination by showing that [jury service] was simply a motivating factor." *Gross*, 129 S. Ct. at 2349. In *Gross*, the Court looked to the statutory text of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and found that 29 U.S.C. § 623(a) prohibits an employer from discriminating against an individual "because of such individual's age." *Id.* at 2350. The Court found that the "ordinary meaning" of "because of" an individual's age is that age was the "but-for" cause of the adverse employment action. *Id.* The language of the Juror Act is very similar to that of the ADEA — it prohibits an employer from taking adverse action against an employee "by reason of" that employee's federal jury service. 28 U.S.C. § 1875(a). Indeed, in defining "because of," the *Gross* Court included the phrases "by reason of" and "on account of" in its definition. 129 S. Ct. at 2350. Thus, under *Gross*, Dr. Jackson must prove by a preponderance of the evidence that she was "excessed" "by reason of" her jury service — that is, that jury service was the "but-for" cause of the decision to excess her.

The Court has no doubt that Dr. Jackson's jury service was *a* motivating factor behind Ms. Warley's acceptance of the loss of a guidance counselor, who otherwise is of particular

-11-

assistance to a principal in dealing with behavior and other student problems. What is lacking is any evidence that her jury service was "the 'but-for' cause," *id.*, of the decision of the LSRT to excess the position.

## IV.  CONCLUSION

The Court has wrestled with this case for much longer than it wished because of the credibility differences between Dr. Jackson and Ms. Warley. The Supreme Court's decision in *Gross v. FBL Financial Services* clarifies Dr. Jackson's burden of proof. In the end, it was the LSRT, not Ms. Warley alone, that decided to excess the guidance counselor position because of clear budget limitations. The inferences that Dr. Jackson wants the Court to draw are too attenuated on this record to satisfy her burden to prove that her jury service was the "but-for" cause of the decision to excess her position. Her petition [Dkt. # 3, Ex. 2] will be dismissed. A memorializing order accompanies this Memorandum Opinion.


Date: August 21, 2009                                        /s/
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge